## A03A0621. WILLIAMS v. THE STATE.
(583 SE2d 172)

PHIPPS, Judge.

A jury found Larawl Ashley Williams guilty of criminal trespass, felony obstruction, and simple assault. He appeals, arguing that the evidence was not sufficient to support the criminal trespass and obstruction convictions, that the prosecutor made improper comments during closing argument, and that he received ineffective assistance of counsel. We find that the evidence was sufficient to support the criminal trespass conviction, but that there was insufficient evidence of obstruction and that Williams received ineffective assistance. We therefore reverse.

Viewed in the light most favorable to the guilty verdicts, the facts are as follows. Williams lived in a shed behind a house owned by his stepfather, William Smiley. Smiley testified that Williams was allowed to stay in the shed as long as he had a job. Williams kept most of his possessions in the shed, including a bed, television, VCR, and stereo system. Smiley, however, kept the key to the shed; Williams did not have one.

On July 20, 2000, Williams went to Smiley's house and asked for the key to the shed. Knowing that Williams no longer had a job, Smiley ordered him to leave the premises. Williams refused. He began cursing, kicking and throwing yard furniture, and attempting to pry open the lock on the shed door. Smiley got a gun and told Wil-

---

liams to stop or he would shoot him. Williams did stop, but then he threatened to "start tearing up" Smiley's car, motorcycle, and boat and to "fuck [him] up" on his way to work in the morning. Smiley's wife, Williams's mother, called the police.

When Corporal Gilbert Walker arrived minutes later, Smiley told him what had happened. Walker saw Williams sitting under a carport near the shed. He asked Williams what the problem was, and Williams replied that he "had no damn problem." Walker asked Williams to stand up, and he tried to handcuff him. Williams initially pulled his hands away, but he cooperated after Officer Tommy Steeley, who had arrived as backup, threatened to use pepper spray on him. Walker then placed handcuffs on Williams's wrists behind his back, took him to the patrol car, and returned to talk to Smiley and complete a police report.

While Walker was talking to Smiley, Steeley stood beside the patrol car. Through the partly opened window, Steeley overheard Williams say "that he was going to [G]lock Corporal Walker when he got . . . back out on the street." Steeley explained at trial that, in street terms, this meant that Williams was going to shoot Walker.

While Williams was waiting in the patrol car, he managed to move his handcuffed wrists to the front of his body, which caused him pain. The officers took him out of the patrol car and removed the handcuffs. As they did so, Williams stared Walker in the eye and said that he "could take [him] one on one and that he would see [him] in the street and that a Glock doesn't miss." Williams also told Walker that "he'd fuck [him] up." Walker then put the handcuffs back on Williams, during which time Williams "did exactly what [Walker] told him to do."

Williams was charged with one count of criminal trespass for refusing to leave Smiley's property, a second count of criminal trespass for damaging the shed, simple assault for threatening Smiley, and felony obstruction for threatening Walker. The jury found him guilty of all counts except criminal trespass for damaging the shed.

1. Williams argues that there was insufficient evidence to support his criminal trespass conviction because the record shows that he was a tenant at will with a legal right to occupy Smiley's property. The State claims that Williams was a guest on Smiley's property, not a tenant.

A person commits criminal trespass if he enters or remains on the premises of another with knowledge that he has been given notice that his presence is forbidden.[1] "Both criminal intent and

---

[1] OCGA § 16-7-21 (b) (2), (3); see also *Arbee v. Collins*, 219 Ga. App. 63, 64 (1) (463 SE2d 922) (1995).

entry without legal right or privilege or without permission of a person legally entitled to withhold the right . . . are elements of the crime."[2]

A person who lawfully occupies property as a tenant cannot be ejected from the property through a prosecution for criminal trespass.[3] A landlord-tenant relationship arises when the owner of property grants another person the right to possess and enjoy the use of the property and the other person accepts the grant.[4] If the length of the tenant's occupancy is not specified, he is considered to be a tenant at will and is entitled to 60 days notice from the landlord before the tenancy may be terminated.[5] The payment of rent is not essential to the creation of a tenancy at will.[6] But "it could be argued that when rent is not paid, the relationship between the parties is more in the nature of that of a host and guest, and the owner of the property is not bound by the statutory duties of a landlord."[7] Whether a landlord-tenant relationship exists is a question of fact.[8]

Williams's occupancy of the shed was conditioned on his having a job; he did not have a key to the shed; and there is no evidence that he paid rent. These facts are sufficient to support the conclusion that Williams was a guest, rather than a tenant, with no legal authority to remain on the property after Smiley told him to leave. The facts also might have supported the conclusion that Williams was a tenant at will. Our function, however, is not to weigh the evidence, but merely to determine whether it was sufficient, under *Jackson v. Virginia*,[9] to support the conviction.[10] We find that it was.

2. Next, Williams contends that there was insufficient evidence to sustain his felony obstruction conviction. We agree.

Felony obstruction occurs when a person "knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the lawful discharge of his official duties by offering or doing violence to the person of such officer."[11] The indictment charged Williams with obstruction based solely on his statements to Walker that he would "fuck [him] up" on the street and that "a Glock doesn't miss." The indictment made no reference to Williams's initial resistance, which

---

[2] (Citations and punctuation omitted.) *State v. Raybon*, 242 Ga. 858, 861 (252 SE2d 417) (1979).

[3] See *Davis v. State*, 147 Ga. App. 107, 108-109 (248 SE2d 181) (1978) (citing *Steele v. State*, 191 Ind. 350 (132 NE 739) (1921)).

[4] OCGA § 44-7-1 (a).

[5] OCGA §§ 44-7-6; 44-7-7.

[6] *Carruth v. Carruth*, 77 Ga. App. 131, 135 (1) (48 SE2d 387) (1948).

[7] *Rowland v. Colquitt*, 214 Ga. App. 544, 546 (1) (448 SE2d 457) (1994).

[8] See generally id.

[9] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[10] See *Clark v. State*, 251 Ga. App. 715, 716 (2) (555 SE2d 88) (2001).

[11] OCGA § 16-10-24 (b).

led to Steeley's threat to use pepper spray on him, or to Williams's relocation of his handcuffs from the back of his body to the front. In fact, Walker testified that the charges were not based on the relocation of the handcuffs and that, while he was removing Williams's handcuffs and replacing them in the back of his body, Williams "did exactly what I told him to do." Thus, it is clear from the indictment and the evidence presented at trial that the obstruction charge stemmed from Williams's verbal threats to Walker, not from any physical resistance.

Under the plain language of OCGA § 16-10-24 (b), obstruction requires two distinct elements: (1) the defendant must offer violence or do violence to the person of a law enforcement officer; and (2) that offer or violence must resist, obstruct, or oppose the officer in the lawful discharge of his official duties.[12] We have recognized that words, alone, can rise to the level of obstruction if they "may reasonably be interpreted as a 'threat of violence' *and* . . . amount to an obstruction or hindrance."[13]

In this case, the first element of obstruction is clearly satisfied by the officers' testimony that Williams threatened to shoot Walker after he got back on the street. The State failed, however, to satisfy the second element. There is no evidence that the threats obstructed Walker from carrying out his official duties. The threats alleged in the indictment were made while Williams was already in custody and physically cooperating with the police.[14] They concerned future acts of violence, not imminent acts that, if carried out, would have prevented Walker from completing Williams's arrest.[15] Moreover, there is no evidence that Walker altered his behavior in any way because of the threats. He testified that "if you have the audacity to threaten me, I'm going to take it serious[ly]. I believe everything you

---

[12] The statute does not define "opposes." Black's Law Dictionary (6th ed.) defines "opposition" as the "[a]ct of . . . resisting; antagonism; state of being opposite or opposed; antithesis. Also, . . . that which is or furnishes an obstacle to some result." Because the felony obstruction statute is "meant to cover obstruction of law enforcement officers in general by the use of violence, threat of violence, or other unlawful means," (citation and punctuation omitted) *Wilson v. State*, 233 Ga. App. 688, 689 (1) (505 SE2d 774) (1998), we hold that "opposes" in OCGA § 16-10-24 (b) involves resisting, antagonizing, or acting as an obstacle.

[13] (Emphasis supplied.) *Wells v. State*, 154 Ga. App. 246, 248 (268 SE2d 74) (1980).

[14] Compare *Gillison v. State*, 254 Ga. App. 232 (1) (561 SE2d 879) (2002) (obstruction occurred where handcuffed defendant kicked at officer and threatened to break his leg while officer was securing him before putting him in patrol car); *Arnold v. State*, 249 Ga. App. 156, 159 (1) (b) (545 SE2d 312) (2001) (evidence was sufficient to sustain obstruction conviction where defendant grew belligerent after being placed in patrol car, began kicking window, and threatened to " 'pop a cap in [the officer's] ass' " if he saw him again).

[15] Compare *Jackson v. State*, 213 Ga. App. 520 (444 SE2d 875) (1994) (obstruction proven where defendant wielded tire iron and threatened to kill officer if he did not leave defendant's brother alone).

tell me." But we cannot infer that Walker was obstructed simply from his testimony that he did not take the threats lightly.

A threat of future violence, by itself, could constitute felony obstruction under OCGA § 16-10-24 (b). But the obstruction conviction in this case cannot stand because there is no evidence that Williams's verbal threats obstructed Walker's completion of his law enforcement duties. Accordingly, we reverse the obstruction conviction.

3. Williams argues that the prosecutor made improper comments during closing argument about his future dangerousness and that his attorney rendered ineffective assistance by not objecting to them.

The comments in question occurred throughout the prosecutor's closing argument. She began by stating:

> Ladies and gentlemen, when something really bad happens, when there is a killing, when there is a bombing, a school bombing or a courthouse bombing, sometimes people say well, I never saw it coming. How did this happen? But if you look behind the really bad event, most times you'll see that there were a lot of things leading up to the event. This disaster just didn't happen one day. There were steps leading to the disaster. This defendant is a disaster waiting to happen.

Shortly thereafter, the prosecutor said that "bad things, terrible things, don't just happen. There are these intermediate steps, these intermediate opportunities to intervene, to stop, to get the attention of the offender." She then said that this case presented such an opportunity. Later, she warned that "if [Smiley getting his gun] is what it takes to get [Williams] to stop his bad conduct this is going to be a disaster."

Mid-argument, the prosecutor stated, "[O]bviously you can't leave this situation to continue to boil because then the police would be responding to something very much more serious than what they responded to." Toward the end, she said:

> [S]ometimes there's a tendency to say oh, it's just words. . . . That's an easy thing to say before something bad happens. But after something bad happens, and I bring to mind Columbine, people are second guessing you every which way. . . . You know, you could have seen it coming. Here were the warning signs. Threats were made.

Finally, she reminded the jury that the events leading to this prosecution were "intermediate steps" and "an opportunity to intervene."

Defense counsel did not object to any of these statements.

To obtain a reversal of a conviction on a claim of ineffective assis-

tance of counsel, the defendant must prove that his lawyer's performance was deficient and that, but for the deficiency, there was a reasonable probability that the outcome of the trial would have been different.[16] We will uphold a trial court's finding that a defendant received effective assistance unless that finding is clearly erroneous.[17]

At the hearing on Williams's motion for new trial, his trial lawyer testified that although he thought portions of the prosecutor's closing argument were objectionable, he elected not to object because "the proverbial toothpaste was out of the tube" and he thought it would be better to address the comments in his own closing argument. The lawyer also testified that it did not occur to him to move for a mistrial based on the prosecutor's improper comments. The trial court found that counsel was not ineffective for failing to object because the comments were not improper and because counsel's decision to remain silent was a reasonable trial strategy.

That finding was clearly erroneous. The comments at issue were plainly improper, and defense counsel's failure to object to them did not fall within the range of reasonable professional conduct.

Our Supreme Court has repeatedly condemned argument about a defendant's future dangerousness during the guilt-innocence phase of a trial because it "simply is irrelevant to the question of whether, under the facts introduced into evidence, the defendant is guilty beyond a reasonable doubt of the crime charged."[18] In *Wyatt v. State*, the court found to be improper a prosecutor's remarks that, if the jury did not convict the defendant of murder, he could "do it again, get his gun back, and ride down on the elevator with the jury as they leave the courthouse."[19] In *Mason v. State*,[20] the court held that these statements by a prosecutor during the closing argument of a murder case were improper: "He must be stopped. It's apparent that he's not going to do it unless you stop him. . . . Stop him before someone else in our community is Mr. Mason's victim. Please, please stop him."[21] In *Rivers v. State*,[22] the court held that a prosecutor acted improperly by stating, during closing argument, "[T]here are real consequences to what you do. There are real consequences if you let these men go."[23] And in *Bellamy v. State*,[24] the court rejected as improper the

---

[16] *Sabbs v. State*, 248 Ga. App. 114, 115 (2) (545 SE2d 671) (2001).

[17] Id.

[18] *Wyatt v. State*, 267 Ga. 860, 864-865 (2) (b) (485 SE2d 470) (1997).

[19] (Punctuation omitted.) Id. at 864 (2) (b).

[20] 274 Ga. 79 (548 SE2d 298) (2001).

[21] Id. at 80, n. 2.

[22] 265 Ga. 694 (461 SE2d 205) (1995).

[23] (Punctuation omitted.) Id. at 697 (6).

[24] 272 Ga. 157 (527 SE2d 867) (2000).

prosecutor's comment, "Who is [the defendant] accidentally going to hurt next?"[25]

The State argues that the prosecutor's comments in this case were not improper because she was merely trying to illustrate why Williams's stepfather and the police officers took his threats seriously. We disagree. The prosecutor essentially told the jury that if it did not convict Williams now, he might go on to commit a catastrophic crime like the notorious massacre at Columbine High School. Her repeated references to Williams's potential for committing future criminal acts were clearly prejudicial, and they had nothing to do with whether he was guilty of the crimes charged.

Citing *Carr v. State*,[26] the State also argues that the prosecutor's reference to the Columbine incident was permissible "illustration." In *Carr*, our Supreme Court held that "[a]nalogizing a defendant or a defendant's case to another well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence."[27] But this case bore no resemblance to the Columbine incident, where multiple people were gunned down at a high school. The prosecutor's reference to that nationally reported tragedy was inflammatory, and it risked distracting the jury's attention from the evidence.

The comments at issue were neither isolated nor offhand. Instead, the specter of Williams's future dangerousness suffused and formed the theme of the prosecutor's closing argument. She repeatedly suggested that, if Williams were not stopped now, "something really bad" could happen, and toward the end of her argument, she likened "something bad" to the Columbine tragedy. Thus, the prosecutor did not merely hint that if Williams were acquitted, he might again commit the same crimes for which he was being tried — criminal trespass, obstruction, and simple assault; rather, she intimated that he might go on to do something far worse — mass murder. There was absolutely no evidentiary basis for these incendiary suggestions.

Both this court and our Supreme Court have recognized that trial counsel's failure to object to improper argument about a defendant's future dangerousness constitutes deficient performance.[28] In *Mason v. State*,[29] the Supreme Court found deficient performance where the defendant's lawyer failed to object to the prosecutor's comments that the defendant "must be stopped . . . before someone else

---

[25] (Punctuation omitted.) Id. at 162 (11).
[26] 267 Ga. 547 (480 SE2d 583) (1997).
[27] (Citation omitted.) Id. at 555 (7) (a).
[28] *Mason v. State*, supra at 80 (2) (c); *Nickerson v. State*, 248 Ga. App. 829, 831-832 (2) (a) (545 SE2d 587) (2001).
[29] Supra, 274 Ga. at 80 (2) (c), n. 2.

in our community is [his] victim."[30] Likewise, in *Nickerson v. State*,[31] this court found deficient performance where defense counsel failed to object to the prosecutor calling the sex crimes defendant a "predator" who "[t]urn[ed] young females' lives into a nightmare" and imploring the jury to "bring the predator to an end" and stop the nightmare.[32] The improper statements in *Mason* and *Nickerson* were arguably less prejudicial and less pervasive than those here. In this case, the improper comments permeated — and poisoned — the prosecutor's entire closing argument. Under these circumstances, defense counsel's failure to object was not a reasonable trial tactic.

There is a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different. Had counsel objected the first time the prosecutor made an improper comment (in the first sentence of her argument), the trial court could have told the jury to disregard it and directed the prosecutor not to make any more such statements. But no objection was made, and the prejudicial statements continued. Given their prevalence and egregiousness, it is highly likely that the statements "divert[ed] the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, [and] by making predictions of the consequences of the jury's verdict."[33]

Moreover, the evidence against Williams was hardly overwhelming. As we ruled in Division 1, the evidence concerning the charge of criminal trespass for failing to leave Smiley's property would have permitted the jury to conclude that Williams was a tenant at will, entitled to prior notice to quit the premises. As we ruled in Division 2, there was insufficient evidence to support the obstruction conviction. And the assault charge boiled down to a credibility contest between Smiley and Williams, who admitted getting angry with his stepfather and "throw[ing] a few things around," but denied threatening to beat Smiley. Because this was a close case, it is even more likely that the improper argument swayed the jury and prejudiced Williams.[34]

Because Williams received ineffective assistance of counsel, his criminal trespass and assault convictions also must be reversed.

4. In light our rulings in Divisions 2 and 3, we need not address Williams's remaining claims of error.

---

[30] Id.

[31] Supra, 248 Ga. App. at 831-832 (2) (a).

[32] Id.

[33] (Citations and punctuation omitted.) *Rivers*, supra at 697 (6).

[34] Compare *Nickerson*, supra at 832 (defense counsel performed deficiently by not objecting to improper argument, but deficiency was harmless error because evidence of defendant's guilt was overwhelming).

*Judgment reversed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED JUNE 5, 2003.

*Jackson & Schiavone, Steven L. Sparger*, for appellant.
*Spencer Lawton, Jr., District Attorney, Ann M. Elmore, Assistant District Attorney*, for appellee.