A03A1728. COLLIER v. THE STATE.
(596 SE2d 795)

PHIPPS, Judge.

Billy James Collier was convicted of two counts of aggravated assault for stabbing Stephen Cambron and James McCoy. His motion for new trial was denied. He appeals, contending that the trial court erred by admitting similar transaction evidence and by ruling that he had not been deprived of effective counsel. While Collier has not

demonstrated reversible error concerning the evidentiary issue, he has clearly shown ineffective assistance of counsel. Accordingly, we reverse, and remand for further proceedings consistent with this opinion, including a new trial.

The state's evidence showed that on the night of August 19, 2001, Collier was at a bar. Cambron, who was also there, noticed a man lying on the ground. While Cambron was bending down to help the man, Collier rushed to them, hit Cambron in the back of his head, backed away, and then pulled out a knife. Cambron did not know Collier and asked him why he had hit him. Collier responded, "Come on, you little son-of-a-bitch." Unarmed, Cambron approached Collier and hit him with his fists. During the ensuing fight, Cambron received knife gashes across his chest and leg. Cambron walked away from the fight and headed back to help the man on the ground. Collier spun Cambron around by the shoulder and then stabbed him in the abdomen. The police arrived and recovered the knife from a woman, who had been seen with Collier earlier that evening.

The state's evidence also showed that on the night of November 8, 2001, Collier was inside a bar and became involved in a verbal altercation among several patrons. For some of the patrons, the verbal altercation escalated into physical fighting outside the bar. Collier followed the commotion outside, where a crowd had gathered. Collier pulled a knife from his pocket. Someone fired a gun. Robert Martin was shot and fell to the ground. While McCoy was leaning down to help Martin, Collier stabbed McCoy in the abdomen. Martin and McCoy were unarmed and had been uninvolved in the earlier verbal and physical fights. The police found a knife inside the bar on the floor beside a slot machine and showed it to Collier. Collier told police first that the knife was his, next that the knife was "like his," and last that the knife was like one he had once owned.

The state introduced evidence of two similar transactions. The first incident occurred at a bar one night in May 1988. An eyewitness testified that Collier began hitting an older, disabled man named Jim Starnes, and a fight ensued between them. When the bar manager, Jim Jones, asked Collier to leave, Collier began waving a gun and threatening to kill Jones and his family. Police found the gun on another patron. The state presented a copy of Collier's guilty plea to terroristic threats entered in connection with that incident.

The second incident occurred at a bar one night in August 1988. An eyewitness testified that Collier was using the bar's telephone when the bar's owner told him that his time on the telephone was limited. After Collier rebuked her, her husband, Danny Clayberger, asked Collier to get off the telephone. Collier swung his fist at

Clayberger, and the two fought. Collier pulled out a knife, and then stabbed Clayberger in the chest. Several patrons beat Collier with pool sticks until he left.

Collier took the stand and gave an account for each incident. He claimed that his actions had been justified because he had been defending others or himself. He explained that he almost always carried a knife to defend himself and that he had not known whether the individuals he injured were armed.

Recounting the Cambron incident, Collier recalled being inside the bar when a friend informed him that a fight was about to begin outside. Collier went outside, where a crowd had gathered around several people kicking and hitting a man. Collier recognized another man who was lying on the ground. Collier headed to help him, and someone shoved him. As he fought that person, others, including Cambron, began beating him. While being shoved and beaten from all directions, Collier pulled out his knife. He grabbed one of the men attacking him and stabbed him. Collier testified, "I thought I was being mobbed and I was getting them off of me."

Recounting the McCoy incident, Collier testified that he had watched the verbal altercation inside the bar move outside. Sitting inside, he could see one of his friends "go across the door one time just flying backwards and then I [saw] him come back." When Collier went outside to check on him, he became briefly involved in the fighting. That fighting ended when everyone scattered at the sound of gunfire. Collier then saw that his friend was pinned to the ground by three men, who were kicking and hitting him. Collier recalled that he pulled out his knife and then "went over there swinging my knife at them," stabbing some person who had charged him.

Recounting the Starnes/Jones incident, Collier testified that he had been "picking at" Jim Jones, that Jones became upset, that an old man approached him and made a gesture toward him, and that he reacted to that gesture by hitting that man. Collier testified that when he realized that the police had been called, he retrieved his gun from his car. He denied threatening anyone with it, stating that he had passed it to a friend only to hide.

Recounting the Clayberger incident, Collier testified that while he was using the telephone, Clayberger "kept banging around on the bar with the pool stick telling me to put the GD phone down, do this, do that." Then, two individuals swung at him with pool sticks, injuring him. During the ensuing fight, he heard someone say, "kill him," at which point, he stuck his knife into the chest of one of the men beating him.

1. Collier contends that the trial court erred in admitting the similar transaction evidence.

(a) Collier argues that the state failed to make the three showings required by *Williams v. State*.[1] *Williams* requires that before independent acts may be admitted into evidence, a hearing must be held, at which the state must make three affirmative showings: it must identify a proper purpose for admitting the independent act; it must establish that the accused committed the independent act; and it must show sufficient similarity between the independent act and the crime charged so that proof of the former tends to prove the latter.[2]

At a pretrial hearing to determine the admissibility of the similar transactions, the state announced that it was seeking to present eyewitness testimony of Collier's prior acts of stabbing Clayberger, hitting Starnes with his fist, and threatening to kill Jones and his family while waving a gun. Although Collier points out various dissimilarities between the independent acts and the charged offenses, the law does not require that they be identical. Whether evidence of an extrinsic transaction is admitted depends on its relevance to the issues in the trial of the case.[3] The state asserted that the evidence countered Collier's defense of justification by showing Collier's modus operandi, scheme, course of conduct, and bent of mind under particular circumstances. The state also asserted that the independent acts were sufficiently similar to the charged offenses because each incident had started at night, in a bar, and had quickly escalated to Collier's commission of or threat to commit great bodily harm to unarmed, male victims. The Starnes/Jones incident was further similar to the charged offenses, the state asserted, because Collier hid his weapon after that altercation.

"When similar transaction evidence is being introduced to prove motive, intent, or bent of mind, it requires a lesser degree of similarity to meet the test of admissibility than when such evidence is being introduced to prove identity."[4] We find that the trial court did not abuse its discretion in determining that the state met the requirements set forth in *Williams*.[5]

(b) Collier argues that the trial court committed reversible error by failing to make an affirmative determination on the record that the independent acts were admitted for some proper purpose.[6] We have previously rejected this argument, holding:

---

[1] 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

[2] Id.

[3] *Mangham v. State*, 234 Ga. App. 567, 569 (1) (507 SE2d 806) (1998).

[4] (Citation and punctuation omitted.) Id.

[5] See id.; *Malone v. State*, 226 Ga. App. 185, 186 (1) (486 SE2d 57) (1997); *Willis v. State*, 214 Ga. App. 479, 480 (3) (a) (448 SE2d 223) (1994).

[6] See *Williams*, supra at 642 (2) (b), n. 3.

> Even if the trial court erred by failing to make specific findings on the record that each of the elements enunciated in *Williams* for admission of the evidence was satisfied, no harmful error occurred because . . . the evidence was sufficient for the trial court to have concluded that the *Williams*[ ] requirements were satisfied.[7]

Having concluded that the trial court was authorized to find that the state met the *Williams* requirements, we find no harmful error.

(c) Collier argues that the state's notice of intent to introduce the independent acts was insufficient. The notice pertinently provided:

> 1. On August 11, 1988, Billy Collier stabbed one James Danny Clayberger in Muscogee County, Georgia which resulted in a no bill by the Grand Jury. 2. On May 13, 1988, Billy Collier committed Terroristic Threats on one Jim Jones and also hit one James Sarner with his fist. A certified copy of the plea of guilty to Terroristic Threats is attached.[8]

Collier points out that the notice failed to state a purpose for the evidence and that the notice did not mention that he had also threatened Jones's family and waved a gun while making the threats. Further, Collier complains that the state did not attach a copy of the "no bill indictment" in the Clayberger incident and that it did not attach a copy of the guilty plea in the Jones incident.[9]

> [T]he notice of intent to introduce evidence of similar crimes should clearly specify the proper purpose for which introduction of such evidence is sought. A statement of purpose advances two aims. First, it allows the defendant the opportunity to investigate the validity, relevancy, and other aspects of the prior offenses. Second, it assists the court in making the essential preliminary determination of whether the State is seeking to introduce the evidence for an appropriate purpose. Reversible error does not automatically

---

[7] *Johnson v. State*, 247 Ga. App. 157, 164 (13) (b) (543 SE2d 439) (2000); see also *Byrd v. State*, 236 Ga. App. 485, 489 (6) (d) (512 SE2d 372) (1999).

[8] While the state's notice alleged that Collier hit "James Sarner," the trial transcript appears to reference that victim as "Jim Starnes." The state's appellate brief describes its notice as naming "James Sarner," but then describes the incident as happening to "Jim Starnes" and, in another section, to "James Starnes." Collier's appellate brief appears to reference that victim as "Sarner." The discrepancy, however, was not presented as an issue on appeal.

[9] Uniform Superior Court Rule 31.3 (B) requires that "[c]opies of accusations or indictments, if any, and guilty pleas or verdicts, if any, shall be attached to the notice."

accrue from the absence of a purpose declaration in the notice, however.[10]

At a pretrial hearing, the prosecutor specified each independent act he sought to introduce as a similar transaction and the purpose of the evidence. Upon hearing that information, Collier did not move for a continuance to investigate the validity, relevance, or other aspects of admissibility of the independent acts. Furthermore, with that information, it was possible for the trial court to make the essential preliminary determination regarding the admissibility of the similar transaction evidence. Although the state's notice should have been more specific, Collier has not shown how his defense was harmed as a result of the state's failure to comply fully with the notice requirements. Therefore, this claim of error presents no ground for reversal.[11]

(d) Collier argues that the court should have deferred to the grand jury's determination regarding the Clayberger incident. However, a grand jury's "no bill" does not preclude a court from admitting similar transaction evidence.[12] Unlike an acquittal, a "no bill" leaves unresolved the issue of whether the accused committed the offense.[13] In this case, at the pretrial hearing, the state made an adequate showing to the court that Collier had unjustifiably stabbed Clayberger.

(e) Collier argues that admission of evidence of the independent acts should have been precluded by the nearly 14-year lapse of time between them and the charged offenses.

> Mere lapse of time between the commission of any prior similar crime and the commission of the offense currently at trial does not render the evidence automatically inadmissible; lapse of time is but one factor to be taken into consideration in determining admissibility. It is the similarity of the offenses within the meaning of *Williams v. State*, 261 Ga. at 640, that determines the admissibility of such evidence, not whether the span of time between offenses is brief.[14]

---

[10] (Citations, punctuation and footnotes omitted.) *Allen v. State*, 242 Ga. App. 367, 368 (2) (533 SE2d 401) (2000).

[11] See id. at 369; *Hawks v. State*, 223 Ga. App. 890, 891-892 (1) (479 SE2d 186) (1996).

[12] See *Williams v. State*, 178 Ga. App. 581, 589-590 (8) (344 SE2d 247) (1986).

[13] Id. at 590.

[14] (Citations and punctuation omitted.) *Mika v. State*, 256 Ga. App. 546, 548 (3) (568 SE2d 818) (2002).

The lapse of time in this case provides no basis for reversing the trial court's ruling.

2. Collier contends that the trial court erred in determining that his trial attorney rendered effective assistance. To establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that there was a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.[15] "There is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy."[16] A trial court's determination that a defendant has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous.[17]

Collier argues that his trial attorney should have objected or moved for mistrial on the grounds that, during closing argument, the prosecutor impermissibly and prejudicially used the similar transaction evidence and injected the issues of punishment and future dangerousness into the guilt-innocence phase of his trial. The record reveals that, early in the closing argument, the prosecutor told the jury that this case was important to "the people that Collier has cut and stomped and hurt throughout his life and the last two years and in the last 14 years." Defense counsel did not object. Shortly thereafter, the prosecutor focused the jury's attention on the fact that Collier had not served any prison time for the similar transactions:

> One of [the similar transactions] resulted in a plea bargain on terroristic threats where [Collier] got four years probation and you'll see my name on that indictment back in 1988. And I want to plead and I want penance and I want forgiveness for taking that plea bargain, for having that plea bargain because perhaps if Mr. Collier had gone off . . . and done some time for beating the other man, maybe it would have gotten his attention and maybe he wouldn't have done what he's done in the last year to get himself in here. So I ask forgiveness on that one.

Defense counsel did not object.

---

[15] *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Barner v. State,* 263 Ga. 365, 367-368 (5) (434 SE2d 484) (1993).

[16] (Citation and punctuation omitted.) *Stephens v. State,* 265 Ga. 120, 121-122 (2) (453 SE2d 443) (1995).

[17] *Amaechi v. State,* 254 Ga. App. 490, 493 (3) (564 SE2d 22) (2002).

The prosecutor then told the jury that it had the duty to make the community safe by sending Collier to prison for his 14 years of criminal activity:

> Ladies and gentlemen, it's been going on we know 14 years ago and last year. And this is my chance to present a case to you of utmost importance because what you do in this — when you make this verdict, what you do is critical, I submit critical, not only to Mr. Collier but to all of us. We can't have Collier on our streets anymore. Collier has forfeited his right to be around us. Collier needs prison. We can't have Collier at the [bar] with his blade and there ain't no law against carrying a knife. We can't have him at the [bar]. We can't have him at the mall.

Still, defense counsel did not object.

Later, the prosecutor again implored the jury to make up for the fact that Collier had not been imprisoned in connection with the similar transactions:

> And I'm sorry about 1988 on that four years probation, but this is our chance to, I submit, correct the record.

The prosecutor concluded by insinuating that the jury had a duty to protect the community from any future danger from Collier:

> [T]hink about whether we can have Collier around any more and whether we need him here and think about how important it is to the witnesses and to everybody.

Defense counsel objected to none of this argument.

At the motion for new trial hearing, Collier's trial attorney was asked why he had remained silent. He answered that, in his opinion, the statements were not blatant violations and that "my trial strategy is unless something is blatant in a closing argument, I do not object to it because if it's a borderline objectionable issue, I believe that all you are doing is focusing the jury's attention on what you are objecting to."

(a) A prosecuting attorney represents, not an ordinary party, but a sovereignty, whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice.[18] As a servant of the law, a prosecutor should prosecute with

---

[18] *Berger v. United States*, 295 U. S. 78, 88 (2) (55 SC 629, 79 LE 1314) (1935).

earnestness and vigor.[19] "But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[20] Because the average juror has confidence that the prosecutor will abide by these obligations, inappropriate argument, insinuations, and assertions of personal knowledge are apt to improperly influence the jury against the defendant.[21]

Our Supreme Court and this court have consistently restricted the use of similar transaction evidence.[22] Yet, the prosecutor here blatantly misused such evidence by focusing the jury's attention on the fact that he had participated in a negotiated plea with Collier with respect to one of the transactions, by then pleading to them for forgiveness for his "taking that plea bargain," and finally, by rallying them in what seems to have been his personal campaign to rectify in the instant case his actions in that prior case. ("[T]his is our chance to, I submit, correct the record.") While a prosecutor has wide latitude to argue inferences from the evidence, "wide latitude" does not extend to that impermissible use of similar transaction evidence.[23] Furthermore, the Supreme Court and this court have repeatedly condemned argument about a defendant's future dangerousness during the guilt-innocence phase of a trial because that issue simply is irrelevant to the question of whether, under the facts introduced in evidence, the defendant is guilty beyond a reasonable doubt of the crimes charged.[24]

We reject the state's argument that Collier's trial attorney's silence was a reasonable trial tactic. The appellate courts of this state have repeatedly recognized that trial counsel's failure to object to this type of improper argument constitutes deficient performance. In *Mason v. State*,[25] the Supreme Court found deficient performance where the defendant's lawyer failed to object to the prosecutor's remarks that the defendant "must be stopped . . . before someone else in our community is [his] victim."[26] Similarly, in *Williams v. State*,[27] this court found deficient performance where defense counsel failed to object to the prosecutor's improper remarks characterizing the

---

[19] Id.

[20] Id.

[21] Id.

[22] See *Williams v. State*, 261 Ga. at 642 (2) (b); *Turner v. State*, 245 Ga. App. 476, 478 (2) (538 SE2d 125) (2000).

[23] See generally *Wyatt v. State*, 267 Ga. 860, 864 (2) (a) (485 SE2d 470) (1997).

[24] See, e.g., id. at 864-865 (2) (b) and cases cited therein.

[25] 274 Ga. 79, 80 (2) (c), n. 2 (548 SE2d 298) (2001).

[26] Id.

[27] 261 Ga. App. 511, 515 (3) (583 SE2d 172) (2003).

defendant as "a disaster waiting to happen," his actions in the incident underlying the case as "intermediate steps," and the jury's role as " 'an opportunity to intervene' " before "something bad" happened.[28]

In this case, the prosecutor's statements were not only improper, they were pervasive.

> Given their prevalence and egregiousness, it is highly likely that the statements diverted the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, and by making predictions of the consequences of the jury's verdict.[29]

Collier's trial counsel's failure to object was not a reasonable trial tactic.[30]

(b) We also reject the state's claim that Collier's trial attorney's failure to object to the prosecutor's numerous improper arguments in closing, or to move for mistrial at the conclusion of the prosecutor's argument, was harmless to Collier. In *Williams*, this court found harmful error where defense counsel's failure to object allowed the prosecutor to permeate and poison the entire closing argument with improper remarks calculated to sway the jury against the defendant and where the evidence was not so overwhelming that it overcame trial counsel's error.[31] Pretermitting the issue of whether the evidence of Collier's guilt can be considered overwhelming, we find a reasonable probability that, but for defense counsel's utterly deficient performance in this regard, the outcome of the trial would have been different — not because the jury would have reached a different verdict, but because the case would never have been submitted to it for deliberation if defense counsel had moved for a mistrial.

This case should have boiled down to a determination by a fair and impartial jury of whether Collier's actions were justified in the 2001 incidents charged. But before the jurors could deliberate Collier's guilt or innocence, the prosecutor inflamed and impassioned them through a series of improper statements, to which defense counsel never objected. Had counsel objected to the prosecutor's first improper remark, the trial court could have instructed the jury to disregard it and admonished the prosecutor not to make any more such remarks. But no objection was made, and no curative measure

---

[28] Id. at 516.

[29] (Punctuation and footnote omitted.) Id. at 518.

[30] See *Mason*, supra; *Williams v. State*, 261 Ga. App. at 517-518.

[31] *Williams v. State*, 261 Ga. App. at 518.

was taken. The prosecutor continued, and using pronounced and persistent improper remarks, he laced the state's closing argument with an impermissible theme: send Collier to prison because he had not been effectively punished for committing the similar transactions and because the community would not otherwise be safe in the future.

That argument distorted the jury's role. Furthermore, as Collier was not, and could not have been, on trial for unindicted or uncommitted crimes, that argument ran afoul of fundamental fairness. We find a reasonable probability that, had Collier's trial attorney moved for a mistrial at the close of the argument, the trial court would have determined that the improper statements and unfair theme so permeated and poisoned the state's closing argument that no curative instruction from the court could have removed the damaging impression planted in the jurors' minds, and that the court therefore would have granted it.[32] Accordingly, the trial court's ruling that Collier received effective assistance of counsel is clearly erroneous.[33] The judgment must be reversed and the case remanded for further proceedings consistent with this opinion, including retrial of the defendant.

3. We consider Collier's remaining claims of error as these issues are likely to arise on retrial.

(a) Collier argues that his trial attorney was ineffective in that he did not seek severance of the two charges of aggravated assault. Defense counsel testified at the motion for new trial hearing that his decision not to move for severance was based on his assessment that, even with separate trials, each jury would have heard about both of Collier's acts because evidence of one aggravated assault would have been admissible as a similar transaction in a trial of the other.

Where a motion to sever is made, a trial court must conduct a two-part inquiry.

> [A] trial court must first determine whether the offenses are joined solely because they are of the same or similar character. If they are, severance is mandatory. If they are not, the court must then decide whether severance would promote a

---

[32] See OCGA § 17-8-75; *Williams v. State,* 261 Ga. App. at 518; *Woodham v. State,* 263 Ga. 580, 581 (1) (b) (439 SE2d 471) (1993) (grant of a motion for mistrial may be required where the injury is so grave that no act of the court could remove the damaging effect), citing *Brooks v. State,* 183 Ga. 466 (188 SE 711) (1936).

[33] See *Williams v. State,* 261 Ga. App. at 518; *Stanford v. Stewart,* 274 Ga. 468, 470 (1) (554 SE2d 480) (2001) (prejudice prong of *Strickland* is satisfied upon a showing that, but for defense counsel's error, a mistrial would have been granted; that prong does not further require a showing that acquittal would result from retrial).

just determination of guilt or innocence as to each offense.[34]

"The court is vested with discretion in this matter, and in the exercise of that discretion it must balance the interest of the defendant with the interest of the State."[35]

Regarding the first part of the inquiry, "offenses have not been joined *solely* because they are of the same or similar character when evidence of one offense can be admitted upon the trial of another, i.e., when they are so strikingly similar as to evidence a common motive, plan, scheme or bent of mind."[36] In the instant case, the charges are sufficiently similar that one would be admitted in the trial of the other. Accordingly, the aggravated assault charges were not joined solely because they are of the same or similar character.

Turning to the second part of the inquiry, the trial court must determine whether the trier of fact would be able to fairly and intelligently judge each offense.[37] In deciding whether a trier of fact can parse the evidence and apply the law to each charge, a trial court must consider the number and complexity of the offenses charged.[38] In the instant case, we do not believe that the complexity of these two charges of aggravated assault would have rendered the jury unable to distinguish the evidence and apply the law intelligently to each charge.

Whether to move for severance is a matter of trial tactics, and the failure to move for severance does not require a finding that counsel was ineffective.[39] Even if Collier's trial attorney had filed a motion to sever the charges, the record does not demonstrate that severance was mandatory. And even if a motion for separate trials had been granted, evidence of one aggravated assault, as well as the similar transaction evidence, would have been admissible in the trial on the other aggravated assault. Under these circumstances, there has been no showing of prejudice to Collier as a result of his trial attorney's decision not to file a motion to sever. The trial court did not clearly err in denying Collier's motion for new trial on the ground that his trial attorney rendered ineffective counsel by failing to seek severance of the charges.[40]

(b) Collier also complains that his trial counsel failed to object when the prosecutor vouched for witness credibility by telling the

---

[34] (Citations omitted.) *Stewart v. State*, 277 Ga. 138, 139 (587 SE2d 602) (2003).

[35] (Citations omitted.) Id.; see *Jarrell v. State*, 234 Ga. 410, 413-414 (216 SE2d 258) (1975).

[36] (Citations omitted.) *Stewart*, supra at 140.

[37] Id. at 139.

[38] Id.

[39] *Corn v. State*, 256 Ga. App. 364, 365 (4) (568 SE2d 583) (2002).

[40] See id.

jury during closing argument that the testimony of a state's witness "sounds just like the truth to me. It's got the ring of truth to it." "It is improper for counsel to state to the jury his personal belief as to the veracity of a witness."[41] As the remark appears to express the prosecutor's personal belief, it was improper.

*Judgment reversed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED MARCH 18, 2004.

*Sexton & Morris, Joseph S. Key*, for appellant.
*J. Gray Conger, District Attorney, David B. Ross, Assistant District Attorney*, for appellee.

---

[41] (Citation and punctuation omitted.) *Alexander v. State*, 263 Ga. 474, 477 (2) (d) (435 SE2d 187) (1993).