**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 20, 2013**

# In the Court of Appeals of Georgia

A13A0998. LONG v. THE STATE.

BOGGS, Judge.

David Long appeals from his convictions of false imprisonment, aggravated assault, terroristic threats, and simple battery.[1] In this appeal, Long asserts the following: (1) the State presented insufficient evidence of venue, terroristic threats, and simple battery; (2) the trial court erred by admitting evidence concerning a similar transaction, a machete and crossbow, and hearsay; (3) the trial court erred by failing to grant a mistrial after a State's witness testified that they found marijuana in the defendant's home; (4) the trial court erred in its instructions on simple assault and aggravated assault; (5) the trial judge erred by failing to recuse; (6) he is entitled to

---

[1] The jury acquitted Long of another count of aggravated assault alleging that Long burned the victim with a lit cigarette.

a new trial because the trial judge communicated with the jury outside his presence; (7) he received ineffective assistance of counsel on numerous grounds; and (8) the trial court erred by sentencing Long beyond the statutory maximum. For the reasons explained below, we affirm Long's convictions, but vacate his sentence for terroristic threats because it exceeded the statutory maximum of five years.

1. When reviewing the sufficiency of the evidence,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the record shows that on October 4, 2010, around 5:00 a.m., a customer at a gas station in Chattooga County saw the victim outside walking past the store window. The customer testified that the victim "had been beat up," and "her

2

face was bruised up and beaten and just - - and she looked bad." "[S]he had blood on her face. Her eye was almost swelled shut. . . . [S]he had abrasions on her . . . wrists . . ., her arms, her neck." The store clerk testified that the victim had "scratches and stuff" on her face, a cut on her head, and a black eye.

When she came inside the store, she seemed hysterical, frantic, and very scared. She did not seem angry. Her hands were tied with blue rope that was covered with camouflage duct tape, and she was not wearing shoes. "[S]he started screaming help, help, please, help me." After the store clerk and customer helped free her hands, "the first thing she said was don't call the police. . . . He'll hurt my kids." She also stated notifying the police "would make things worse."

After the customer determined that the victim's children were not with the man who had beaten the victim, the police were notified. While the customer waited with the victim for the police to arrive, she kept repeating, "[D]on't call the police," and also stated that the man who beat her up wanted to kill her. She told the customer that after she escaped, she drove away from the Alabama state line, because she thought he would look for her in Alabama. Both the customer and the store clerk denied that they prevented the victim from leaving the store until the police arrived.

When sheriff's deputies arrived, they ran the license tag on the car in which the victim had arrived and when they asked about the registered owner, David Long, she stated that he was the person "who did this to me" and that it had happened at his house. While she seemed "very reluctant to say anything," she eventually "opened up just a little bit more and advised that he had got mad. And so that she wouldn't leave he had taped her hands and ankles together and that he had struck her." She also stated, however, that she did not want the police involved and did not want any charges to be brought, explaining "that her ex-husband had worked in law enforcement and they had had a difficult situation involving court matters." When a female deputy arrived, the victim told her "that she'd gotten into an argument with her boyfriend over a custody battle about her children and he became angry. And she had wanted to leave and he wouldn't let her leave. And he had duct taped her hands together and tied her feet together and then he assaulted her." She also told the female deputy that the incident took place at her boyfriend's house on Everett Springs Road in Rome, Georgia.

Because the car was registered at an Everett Springs Road address in Floyd County and the incident took place at this address, the officers notified the Floyd County Police Department, and Officer Jones responded. When he arrived, he

4

observed a "blackened right eye" and a "cut above her left eye" and the victim appeared nervous and scared. The victim stated that after her argument with Long escalated, "he struck her in the face several times and threw a . . . Coke can at her face striking her in the head." Officer Jones testified that the victim never said she wanted to leave and denied telling the victim that she could not drive away in Long's car. After taking the victim to the police station, "[s]he was still a little reluctant about giving a statement." Officer Jones agreed that based on his experience in domestic violence cases, "it's not uncommon for the victim to not want to talk."

The victim's sister testified that the victim called her the next day after she left the police station and told her that Long had "hit her and beaten her up," giving her a cut over her eye that was still bleeding. Her sister told her to go to the emergency room, met her there, and saw that both of the victim's eyes were black, she had a still-bleeding cut above her eyebrow, and "just bruises everywhere." The hospital ran tests to determine if she had "internal damage[] from where he had beat her on her chest and on her stomach."

The sister described the victim as "the strong one" normally, but in the hospital, the victim was terrified, completely distraught, shaking, sobbing, and crying. At the hospital, the victim told her sister, "[h]e hit me and just kept hitting me. He wouldn't

stop. I begged him, I said, please stop. Please stop. And he wouldn't." She also told her sister that Long would not let her leave, threatened to kill her as well as her two children, and dismember and hide her body and claim that she had left for work and he did not know what had happened to her. The victim related that Long also stated that "he knew it would be a long time before he ever got out if she escaped [from him] and that he would wait" until he got out and then kill her children, her children's children, as well as her parents, siblings, and grandfather.

A few days after the incident and while Long was in jail, the victim, her mother, and sister went to the police station where the victim hand-wrote the following statement: :

> Today is October the 7th, 2010. I'm writing about events that happened on October 4th, 2010. I went to court in Alabama on contempt charges dealing with my divorce. I had planned for my son to testify that I did not interfere with the relationship between my children and the father. Sonny David Long spoke to my son on the phone after court. He was upset that my son did not get a chance to speak in court. I took my children to their visitation with their father and drove to Georgia. Sonny called and asked what I wanted for supper, that he was in town and [. . .] bring us something home. When I got to the house I was on the phone with a friend and sat in my car for a little while. He was not home yet. His nephew Chad and a friend were in the garage. He had told Chad to tell me to make brownies as soon as I got there. Since I was on the

phone Chad did not interrupt me though. Sonny called the house phone and Chad brought it to me in the car. I got off the telephone with my friend and talked to Sonny. He was upset that Chad didn't come tell me as soon as I got there and got - - at me when I tried to explain that I was still in the car. He pulled up after a minute later and fussed at Chad. I didn't hear all of it, just the end of him telling Chad and friend that everyone in his life had lied to him except his friend.

We went inside, ate supper, and got ready to go to the woods to get it ready for hunting. In the woods things were fine. On the way home he did a little fussing saying that as a mother all I had to do was tell the judge my son wanted to speak and she had to let him. Once we got home I got ready for bed and laid down. He and his friend got all the hunting stuff laid out for the next day.

Around 1:00 A.M. he came in the bedroom and started fussing at me. He said I had ruined his life now and he was never going to be happy. I tried to talk to him but he just kept saying shut up, you are nothing but a lying whore. He kept asking who taught me to lie. When I would say no one he would get madder. He said if I didn't answer he would hit me. I told him he had promised to never hit me and he said life was over so it didn't matter. I finally answered my mom and he hit me on the right side of my head with an open hand. He said this was his last chance in life and I had taken it away. I told him, no, I hadn't, that we still had a court date to get permission for me and the children to move to Georgia and we were getting married and everything would be fine. He said I was a f'ing stupid bitch if I thought everything was going to be fine and he hit

me again. He said it was my fault his mother died. That she gave up fighting because she thought we would marry soon. He said since I killed his mother he was going to kill my family. When I said no, please don't, he said I was a selfish bitch that only cared about myself and he hit me several times in the head and stomach. He told me that now it was so bad he could never let me go and where did I want to be buried. He said he would take my van to Tennessee to a bad place and put some drugs in it and swear that I left for work that morning and he never saw me again. I told him I had to go to the bathroom and he said I couldn't leave the room and that I had to go in the room. So I got a towel and used the bathroom in the floor. Then he started saying he wished he had enough pills for [us] to take together so we could just die together that night. He said he was not going back to prison no matter what.

He said he had to go to sleep, that he wasn't going hunting and he was going to tell his friend that he wasn't going and he knew it was going to be the last time he ever saw him. He said he had to tie me up because he knew I would try to leave. He ripped some cords off a massage pad and something else and tied my feet together. He then left the room and came back with some camo duct tape. He put a white t-shirt around my feet and duct taped them several times. He said if I had to go to the bathroom anytime between now and when I died I would have to go in the bed. He wrapped a cord around my hands and taped them up too. He said, yes, he knew what he was doing because he had done it before. He said if I happen[ed] to get away he would find me and my kids and kill them. It didn't matter how long from now it took, he would kill my whole family. He would kill my daughter's kids in front

of her and enjoy every minute of it. He just kept saying I had taken his last chance to be happy. He was standing over me and my hands and feet were tied and taped and he hit me in the chest with his fist and in the stomach twice. He said he wished he had a gun to shoot me and then himself. He had a machete on the dresser and he said he would just take it and stab it right though my chest and watch me die, then go get a gun and kill himself. He said he loved me so much but I took his life away so now he had to take mine because he was not going to prison. He said we could last a few days maybe. Then he looked at my head and said, no, it was so bad that I would probably be dead before he woke up.

These are a few things that happened before he tied me up that I forgot to put in. He was smoking and put a lit cigarette to the top left side of my face above my eye. I knocked it out of his hand and he lit another one saying he would put them out on me all night long. He put his hand around my neck and choked me. He threw a Coke can half full at my head and busted my eye. He laughed and said it was going to leave such a bad scar no man would ever want me. He said he had to disfigure me somehow so I would always remember him. What did I want him to cut off? a hand? arm? leg? foot what? When I said toe he hit me again. He said I would have to have a closed casket [because] no one was going to be able to recognize my face, that he was going to crack every bone in my face. He said he knew he would get 25 years for kidnaping, false imprisonment and assault.

He fell asleep shortly after tying me up. I waited a little while to make sure he was . . . good and asleep. I tried to talk to him. I slowly got out

of the bed and looked for my purse but couldn't find it. I heard someone in the kitchen. I managed to get the bedroom door unlocked and get halfway down the hall. His friend was coming from the hall and I told him he had to help me, that Sonny was going to kill me. He said he couldn't and I walked away. I grabbed a knife from the kitchen and cut my feet loose, took the extra key to his jeep and left. I drove the opposite way I normally would in case he was following me. I went to a gas station in Summerville and they cut my hands free for me and called the police.

After providing a written statement, the victim obtained a protective order for herself and her family from the same judge who presided over Long's criminal trial in this case. The victim later requested that her petition be dismissed, stating, "It is my sincere hope to reconcile and continue my relationship with David Long. This decision comes after careful consideration and prayer. I ask the court for a quick dismissal." She also asked the district attorney to dismiss the criminal case against Long and revoked her permission for use of her medical records.

During a search of Long's home pursuant to a warrant, the police found three rolls of camouflage duct tape that matched the tape used to bind the victim; a partial roll was found on the floor next to the bed in the master bedroom. Police also

photographed a machete on the dresser and a crossbow loaded with an arrow and cocked taut.

The victim testified at trial that she was presently engaged to Long and claimed that Long tied her up and hit her during sex with her consent because she liked "rough, violent sex." When confronted with evidence that Long placed the duct tape over her sweatshirt and sweatpants, she contended that they had sex while she was fully clothed. She claimed that she lied about what had really happened because she was embarrassed about the nature of her sex life and did not want her ex-husband to use it against her in their ongoing custody dispute. She claimed that the details in her written statement came from her imagination and details provided to her by Officer Jones about another crime committed by Long in a different county.[2] She also asserted that she left the house with her hands still tied because she was angry with Long and did not want to ask him for help. She admitted that the incident at issue took place at Long's home in Floyd County and that they had argued about the hearing involving her ex-husband.

---

[2] Officer Jones testified that he could not access police reports from another county on his computer as alleged by the victim.

A similar transaction witness testified that she dated Long in 2005. During a period when they had parted ways, she went to his house to discuss dating again. When they were in his bedroom, he became angry when she did not want to have sex with him. He hit her everywhere, but mainly in the face, and called her a b---h and a w--re. He threatened to kill her and her family, including a niece and a nephew. He stated that he would bury her and put her car at a truck stop. He also threatened to cut off her fingers and toes and cut out her eyes.

Long hit and threatened her for a long period of time – "9:00 at night till probably 6:30/7:00 the next morning." When she told him she needed to use the bathroom, he told her "[t]o go on the floor." He later relented and took her to the bathroom while holding a knife against her. The first time she tried to leave and ran out of the house, he chased her and dragged her back inside. She also ran into the room where his mother was sleeping and told her that Long was going to kill her. When the mother left, Long threatened to kill himself and the witness if his mother called the police. When Long "finally passed out," the victim grabbed her car keys and drove straight to a nearby courthouse. Following a trial on the similar transaction, Long was found guilty of numerous crimes, including false imprisonment, terroristic threats, and battery.

12

Long asserts that the State presented insufficient evidence of venue, terroristic threats and simple battery. With regard to venue, the victim testified that the incident took place at Long's home in Floyd County. See *Boxer X v. State*, 237 Ga. App. 526, 532 (9) (515 SE2d 668) (1999) (victim testimony about location of incident within county sufficient to prove venue).

With regard to terroristic threats, the State presented sufficient evidence of corroboration under OCGA § 16-11-37 (a). "[S]light circumstances may be sufficient for corroboration and the question of corroboration is one solely for the jury. Furthermore, if there is any evidence of corroboration, this court will not go behind the jury verdict and pass on its probative value." (Citation and punctuation omitted.) *Maskivish v. State*, 276 Ga. App. 701, 703 (2) (624 SE2d 160) (2005). A witness's demeanor after the threat provides evidence of corroboration. See *Hall v. State*, 292 Ga. App. 544, 548 (2) (664 SE2d 882) (2008) (victim upset and nervous after police arrived). In this case, the victim's demeanor after the threat provided adequate corroboration to support Long's terroristic threat conviction. See id.; *Pringle v. State*, 281 Ga. App. 235, 237-238 (1) (a) (635 SE2d 839) (2006) (police officer described victim as visibly shaken, scared and jittery).

Sufficient evidence also supports Long's battery conviction. The indictment alleged that Long struck the victim in the eye with his fist, and the evidence showed that the victim had two black eyes and stated numerous times before trial that Long had struck her in the face. While the victim did not use the word "fist" in any of her previous inconsistent statements, the jury could infer from the resulting black eye that Long struck her in the eye with his fist. See *McGill v. State*, 123 Ga. App. 20, 22 (2) (179 SE2d 297) (1970) (physical precedent only) ("jury was authorized to draw from their own human experience from the connection of cause and effect and observation of human conduct, . . . that the striking of this woman upon her head with a man's fist could produce a knot . . . and her own lack of knowledge in no way causes the State's case to fail").

2. Long asserts that the trial court erred in its admission of certain evidence. "On appeal, the admission of evidence is reviewed for an abuse of discretion." *Burgess v. State*, 292 Ga. 821, 823 (4) (742 SE2d d 464) (2013).

(a) Long contends that the trial court committed numerous errors in connection with its admission of the similar transaction evidence.

(i) We find no merit in his contention that the trial court erred by allowing the State to introduce evidence of crimes other than false imprisonment because the State

14

listed only "false imprisonment" as the "similar crime or transaction" in its notice of intent. In addition to listing the date of the crime, the victim's name, and the county in which the crime was committed, the State attached a copy of the conviction that included other charges for which Long was convicted and also provided copies of the incident report, the victim's statement, and an investigator's summary. At the hearing pursuant to Uniform Superior Court Rule 31.3 (B), Long objected to the admission of any evidence other than that related to false imprisonment, but did not claim any surprise or inability to respond to the other convictions arising out of and occurring on the same date as the false imprisonment conviction listed in the notice. The trial court ruled that the State could submit evidence about "the rest of it" and that "[a]nything that surrounds the incident, the res gestae of the incident of false imprisonment, is admissible."

> Superior Court Rule 31.3 (B) requires that notice be in a specific form to ensure that the State *actually* notifies the defendant of its intent to use certain evidence so that the defendant will have a *meaningful opportunity* to rebut that evidence. The rule also is designed to provide a criminal defendant with *fair and adequate* notice of the State's intention to utilize similar transaction evidence so that questions as to the admissibility of such evidence can be resolved before trial; and the purpose of the length of the notice period is to allow defendant the

15

opportunity to investigate the validity, relevancy, and other aspects of admissibility of the prior offenses.

(Emphasis in original.) *Wells v. State*, 208 Ga. App. 298, 304-305 (2) (d) (430 SE2d 611) (1993). In this case, we conclude that even if the State's notice could have been more specific, it substantially complied with the notice requirement and Long has not demonstrated how his defense was harmed as a result of the State's failure to provide a more complete notice. See id.; *Collier v. State*, 266 Ga. App. 345, 350 (1) (c) (596 SE2d 795) (2004); *Sweatman v. State*, 181 Ga. App. 474, 475 (1) (352 SE2d 796) (1987).

(ii) Long contends that the trial court should not have admitted the similar transaction evidence because it was "not similar and not relevant," and the prejudicial effect outweighed the probative value of the evidence.

> Evidence of a similar transaction may be admitted if the State demonstrates that (1) evidence of the independent offense or act is being offered not to raise an improper inference as to the accused's character but for an appropriate purpose; (2) the evidence is sufficient to establish that the defendant committed the independent offense or act; and (3) there is a sufficient connection or similarity between the independent offense or act and the crime charged such that proof of the former tends to prove the latter.

16

(Citation and punctuation omitted.) *Harvey v. State*, 292 Ga. 792, 793-794 (2) (741 SE2d 625) (2013). Moreover, "[w]e will uphold the trial court's decision to admit a similar transaction unless it is an abuse of discretion." (Citation and punctuation omitted.) *Muhammad v. State*, 290 Ga. 880, 882-883 (2) (725 SE2d 302) (2012). Additionally,

> [I]n cases of domestic violence, prior incidents of abuse against family members or sexual partners are more generally permitted because there is a logical connection between violent acts against two different persons with whom the accused had a similar emotional or intimate attachment." Such acts can demonstrate "the accused's attitude or mindset (i.e., his bent of mind) as to how sexual partners should be treated. Prior acts can also show an accused's course of conduct in reacting to disappointment or anger in such a relationship, evidencing a pattern." Such evidence may be particularly important in domestic violence cases where the incidents often occur at home, in private, and may involve only the conflicting testimony of the two parties involved.

(Citations and punctuation omitted.) *Brigman v. State*, 282 Ga. App. 481, 485 (639 SE2d 359) (2006).

Long argues that the acts here were not similar because the victim in this case was falsely imprisoned through the use of binding, while the victim in the similar transaction was falsely imprisoned through the use of a knife and the presence of a

shotgun. But "[w]hen considering the admissibility of similar transaction evidence, the proper focus is on the similarities, not the differences, between the separate crime and the crime in question." (Citation and punctuation omitted.) *Latimore v. State*, Ga. App. (748 SE2d 487) (2013). Focusing upon the similarities here shows that in both incidents, Long hit women he was dating after losing his temper. He threatened to kill them and their families, denied them the use of the bathroom, and engaged in this conduct even though others were present in the home. He also threatened both women with bodily mutilation, and they escaped after he fell asleep. Based on these strong similarities, the trial court did not abuse its discretion by admitting evidence of the similar transaction. See *McNaughton v. State*, 290 Ga. 894, 895-896 (2) (a) (725 SE2d 590) (2012).

(iii) Long asserts that the trial court erred by allowing the State to introduce into evidence photographs showing injuries to the similar transaction victim's face. Trial counsel objected on the ground that the pictures were inflammatory and demonstrated injuries for an aggravated battery charge for which Long was acquitted. The photographs show that the victim had lacerations on her face and a black eye. But the aggravated battery charge for which Long was acquitted alleged that he broke the victim's tooth, the victim did not testify about losing her tooth, and the photographs

18

do not show her teeth. We find no abuse of discretion in the trial court's admission of the photographs. See *Arrington v. State*, 286 Ga. 335, 343-343 (13) (b) (687 SE2d 438) (2009) (finding no error in trial court's admission of photograph of similar transaction victim's dead body); *Williams v. State*, 269 Ga. App. 512, 513-514 (2) (604 SE2d 592) (2004) (no error in admission of photographs showing injuries received by victim in similar transaction).

(iv) To the extent Long asserts the following claims in his brief, they are waived based upon his failure to raise these objections during the trial: alleged deficiencies in the trial court's instruction to the jury prior to the similar transaction testimony and a violation of the collateral estoppel doctrine through the introduction of specific facts related solely to charges for which he was acquitted;[3] See *Johnson v. State*, 292 Ga. 22, 26-27 (4) (733 SE2d 736) (2012) (use of evidence of prior crime

---

[3] The similar transaction victim testified that Long hit her with a heater that he threw at her, but Long was acquitted of a simple battery count alleging that he threw an electric heater at her and hit her with it. The only objection to this testimony raised by Long's trial counsel was that this was beyond the scope of the notice for false imprisonment. He did not raise issues of collateral estoppel based upon Long's acquittal when this evidence was admitted, nor during the hearing on the admission of similar transaction evidence.

The similar transaction victim also testified that Long "hit his mother," and he was acquitted of a simple battery count alleging that he hit his mother with a belt. Trial counsel raised no objection to this testimony.

19

that is otherwise admissible precluded if State attempting to relitigate facts resolved in defendant's favor in prior trial); *Walker v. State*, 314 Ga. App. 714, 716 n. 3 (725 SE2d 771) (2012) ("we will not consider matters, even of constitutional magnitude, that were not raised and ruled upon in the trial court").

(b) Long argues that the trial court erred by admitting "hearsay evidence regarding the information received from running the tag on Long's vehicle" because the officer who actually obtained the information did not testify. He contends that this evidence was harmful because it established venue. As the victim testified that the incident occurred at Long's house and that it was located in Floyd County, any error in the admission of the alleged hearsay regarding venue was harmless because it was cumulative. *Wright v. State*, 291 Ga. 869, 879 (3) (a) (734 SE2d 876) (2012).

(c) Long claims that the trial court erred by allowing the victim's sister to testify about statements the victim made to her about the incident. This claim has no merit because the victim testified and both parties were therefore entitled to prove her prior consistent and inconsistent statements. *Hambrick v. State*, 278 Ga. App. 768, 769-770 (2) (629 SE2d 442) (2006). See also *Frazier v. State*, 257 Ga. 690, 696 (13) (362 SE2d 351) (1987).

(d) Long asserts that he is entitled to a new trial because the trial court erred by allowing the State to present evidence that loaded crossbows and a machete were in his home when the State executed a search warrant. [T]he trial court has wide discretion in determining relevancy and materiality, and furthermore, where the relevancy or competency is doubtful, it should be admitted, and its weight left to the determination of the jury." (Citation omitted.) *Ridley v. State*, 290 Ga. 798, 803 (8) (725 SE2d 223) (2012).

As the victim reported in her written statement that Long threatened her with a machete, told Officer Jones it was on the dresser, and the machete was found in the bedroom where the incident occurred, the trial court did not err by admitting this evidence. To the extent that the trial court may have erred by allowing evidence of the crossbows, we find its admission harmless, particularly in light of the evidence showing that Long was preparing to go hunting the next day. *Chambers v. State*, 250 Ga. 856, 861 (5) (302 SE2d 86) (1983) (admission of gun not used in crime harmless even though it was not relevant evidence).

3. Long argues that the trial court erred by failing to grant him a mistrial after a State's witness testified that the police found marijuana when they searched his home. "By failing to renew either his objection or his mistrial motion after the trial

21

court took curative action with regard to the [marijuana evidence], appellant has waived this enumeration on appeal." *Williams v. State*, 272 Ga. 335, 337 (4) (528 SE2d 518) (2000). See also *Hernandez v. State*, 317 Ga. App. 845, 848 (1) (733 SE2d 30) (2012). While Long asked the trial court to officially deny his motion for a mistrial after the jury returned a verdict, this untimely action failed to preserve the issue for our review. See *Kim v. State*, 298 Ga. App. 402, 402-403 (1) (680 SE2d 469) (2009). A renewal of a motion for mistrial "must occur immediately; it is not timely if it comes at the close of all the evidence, at the close of the State's evidence, or following the completion of the witness's testimony and that of a subsequent witness." (Citations, punctuation and footnotes omitted.) Id. at 403 (1).

4. Long's complaints about errors in the trial court's instructions to the jury on simple assault and aggravated assault were waived because trial counsel made no objection to these charges below. See *Collier v. State*, 288 Ga. 756, 758-759 (4) (707 SE2d 102) (2011); OCGA § 17-8-58 (a). We must therefore review the purported error in the trial court's instructions for plain error, even though Long has not argued plain error on appeal. See *State v. Kelly*, 290 Ga. 29, 32 (1) n. 2 (718 SE2d 232) (2011). As the Supreme Court has noted, "the hurdle to establishing plain error is high . . . , and therefore . . . the failure to specifically articulate how the alleged error

22

satisfies this high standard increases the likelihood that . . . claims in this regard will be rejected." Id. at 32 n.2 (1). Having reviewed both of the charges at issue as a whole, we find no error, much less any plain error. See *Clayton v. State*, 319 Ga. App. 713, 716 (2) (738 SE2d 299) (2013) (finding no error in trial court's pattern simple assault charge); *Marriott v. State*, 320 Ga. App. 58, 64-65 (2) (b) (739 SE2d 68) (2013) (affirming conviction because, after taking charge as a whole, jury of average intelligence would not have been confused by the charge, and trial court's charge properly set forth the basis on which the jury was authorized to convict).

5. Long claims that the trial court erred by failing to recuse because it could not be impartial after issuing the temporary family violence protective order against Long at the victim's request. The record shows that Long did not file a motion to recuse until the day of trial. Uniform Superior Court Rule 25.1 provides that a recusal motion

> shall be timely filed: in writing and all evidence thereon shall be presented by accompanying affidavit(s) which shall fully assert the facts upon which the motion is founded. Filing and presentation to the judge shall be not later than five (5) days after the affiant first learned of the alleged grounds for disqualification, and not later than ten (10) days prior to the hearing or trial which is the subject of recusal or disqualification, unless good cause be shown for failure to meet such

23

time requirements. In no event shall the motion be allowed to delay the trial or proceeding.

In this case, the record shows that the trial court granted the temporary protective order on October 7, 2010, that Long would have been notified of the protective order, that the trial judge was assigned to Long's criminal case no later than April 5, 2011, that Long did not seek to recuse the trial judge until May 2, 2011, and made no attempt to excuse his late motion with a showing of good cause. Because the motion to recuse was untimely, the trial court did not err by denying it. See *Crosbie v. State*, 304 Ga. App. 613, 614 (1) (697 SE2d 278) (2010).

6. Long asserts that he is entitled to a new trial, because the trial court communicated with the jury outside of his presence. The record, however, does not affirmatively demonstrate this fact, and following a hearing before a senior judge who did not try the case, the senior judge concluded that Long failed to meet his burden of demonstrating that the communication occurred outside his presence. Based upon the evidence in the record supporting the senior judge's conclusion, we find no merit in this enumeration. See *Gosnell v. State*, 247 Ga. App. 508, 508-509 (1) (544 SE2d 477) (2001) (rejecting claim for violation of constitutional right to be present based

upon defendant's failure to "carry his burden of showing affirmatively by the record that error was committed").

7. Long contends his trial counsel provided ineffective assistance in numerous ways. We cannot consider several of these claims, however, because Long did not assert these particular claims of ineffective assistance below and they are therefore waived.[4] See *Gaither v. State*, 312 Ga. App. 53, 55-56 (3) (a) (717 SE2d 654) (2011).

Other assertions of ineffective assistance have no merit because trial counsel either testified that he made a strategic decision or we must presume that his conduct was strategic.[5] See *Dukes v. State*, 285 Ga. App. 172, 174-175 (2) (645 SE2d 664) (2007). "Tactical errors . . . will not constitute ineffective assistance of counsel unless

---

[4] Long claims for the first time on appeal that trial counsel was ineffective for failing to follow the procedural requirements for a motion to recuse; failing to file a demurrer or motion to dismiss Count 2 of the indictment; and failing to object to the trial court's charges on simple and aggravated assault.

[5] These assertions include that trial counsel failed to object to three parts of the State's closing argument and failed to impeach the similar transaction victim with evidence of a prior felony conviction after she admitted that she had an addiction to narcotics. As we cannot say that trial counsel employed an unreasonable tactic that no competent attorney would have made, these particular claims of ineffective assistance fail. See, e.g., *Braithwaite v. State*, 275 Ga. 884, 886 (2) (572 SE2d 612) (2002) (concluding attorney did not provide ineffective assistance by failing to object to improper closing argument because "attorney reasonably chose silence, and we will not use hindsight to second-guess that decision on appeal").

those errors are unreasonable ones no competent attorney would have made under similar circumstances." (Citation and punctuation omitted.) *Brown v. State*, 292 Ga. 454, 456 (2) (738 SE2d 591) (2013).

Still others fail because counsel's performance was not ineffective.[6] Other ineffective assistance claims lack merit, because Long cannot demonstrate a reasonable probability that the outcome of his trial would have been different if his counsel had performed differently.[7]

---

[6] One of these claims is that counsel failed to object to alleged improper emphasis while the trial court read the jury charges. Based upon this court's review of the audiotape of the charge, we find nothing "which could reasonably be considered prejudicial against [Long]." *Hines v. State*, 248 Ga. App. 752, 755 (2) (548 SE2d 642) (2001). And based upon our holding in Division 6 affirming the trial court's factual finding that it did not engage in ex parte communications with the jury, Long's corresponding ineffective assistance of counsel claim fails.

[7] No prejudice resulted from trial counsel's failure to move to suppress evidence obtained during the execution of a search of Long's home (duct tape and photographs of the defendant, machetes, and crossbows) based upon an alleged technical defect in the address of the search warrant. See *Lowe v. State*, 310 Ga. App. 242, 245-246 (2) (c) (712 SE2d 633) (2011). Likewise, Long cannot demonstrate prejudice flowed from trial counsel's failure to obtain a certified copy of the gas station customer's prior felony conviction before he finished testifying in the State's case. Because the record does not include a certified copy of this felony conviction, we cannot evaluate its admissibility or any impact it may have had upon the outcome. See *Wallace v. State*, ___ Ga.___ (3) (a) (Case No. S13A0988, decided October 21, 2013).

26

The only ineffective assistance of counsel claim warranting a more detailed explanation of our holding is the claim that trial counsel should have objected to the introduction of Long's prior sentence and indictment for the similar transaction. As explained in Division 2 (a) above, the trial court did not err by admitting similar transaction evidence concerning the 2005 incident with Long's ex-girlfriend. During cross-examination of the ex-girlfriend, trial counsel established that this witness had a drug addiction and that Long was found not guilty of the more serious charges arising out of that incident - - aggravated battery and aggravated assault. Long does *not* assert on appeal that this trial tactic amounted to ineffective assistance of counsel.

Instead, he asserts that trial counsel should have objected to the admission of his judgment of conviction, which showed his sentence, and the indictment providing additional detail for the counts outlined in the judgment of conviction.[8] Based on the admissible evidence surrounding the similar transaction and trial counsel's tactical decision to bring out evidence of Long's acquittal during cross-examination, we conclude that Long cannot meet his burden of proving a reasonable likelihood that the outcome would have been different if the documents pertaining to his prior

---

[8] Long does *not* assert that trial counsel was ineffective for failing to raise collateral estoppel as a bar to evidence of the crimes of which he was acquitted. See *Johnson v. State*, 292 Ga. 22, 27 (4) n. 4 (733 SE2d 736) (2012).

convictions had been excluded. See *Matthews v. State*, Ga. (2) (Case No. S13A1170, decided November 4, 2013) (finding it highly unlikely that the admission of the sentencing order for the defendant's prior convictions contributed to the jury's guilty verdict); *Robbins v. State*, 277 Ga. App. 843, 845 (2) (627 SE2d 810) (2006) (holding same with regard to defendant's sentences and convictions in similar transactions); *Faniel v. State*, 291 Ga. 559, 562-563 (2) (731 SE2d 750) (2012) (finding admission of similar transaction for which defendant was acquitted did not contribute to convictions because acquittal "effectively in evidence" through other admissible evidence); *Frazier v. State*, 261 Ga. App. 508, 509-510 (3) (a) (583 SE2d 188) (2003) (no prejudice resulted from admission of similar transaction evidence regarding one charge for which defendant was acquitted when he was convicted of two other charges in connection with the similar transaction).

8. In his remaining enumeration of error, Long asserts, and the State concedes, that his ten-year sentence for terroristic threats is void because it exceeds the statutory maximum of five years. See OCGA § 16-11-37 (c). We therefore vacate his sentence for terroristic threats and remand this case for resentencing in accordance with OCGA § 16-11-37 (c). See *Smith v. State*, 322 Ga. App. 549, 552 (2) (745 SE2d 771) (2013).

*Judgment affirmed, sentence vacated, and case remanded for resentencing.*

*Doyle, P. J., and McFadden, J., concur.*