**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 14, 2015**

# In the Court of Appeals of Georgia

A15A1154, A15A1155. IN THE INTEREST OF: C. S., a child (two   BO-042C,
    cases).                                                   043C

BOGGS, Judge.

A juvenile court adjudicated 16-year-old C. S. delinquent for acts which, if committed by an adult, would have constituted aggravated assault, possession of a firearm during the commission of a felony, and violation of the Georgia Street Gang Terrorism and Prevention Act. The judge ordered that C. S. be placed in confinement for 24 months and kept in the custody of the Department of Juvenile Justice until he reaches age 21. In Case No. A15A1154, C. S. appeals, challenging among other things, the sufficiency of the evidence. In Case No. A15A1155, he asserts error related to the denial of his motion for an appeal bond. For the reasons explained below, we affirm in Case No. A15A1154 and dismiss Case No. A15A1155 as moot.

1. C. S. asserts that the State failed to prove venue. But the victim's testimony that the crimes occurred in Glynn County was sufficient to establish venue. See *Long v. State*, 324 Ga. App. 882, 889 (1) (752 SE2d 54) (2013).

2. C. S. challenges the sufficiency of the evidence.

> In considering a challenge to the sufficiency of the evidence supporting an adjudication of delinquency, we construe the evidence and every inference from the evidence in favor of the juvenile court's adjudication to determine if a reasonable finder of fact could have found, beyond a reasonable doubt, that the juvenile committed the acts charged. Thus, the standard of review on appeal in a case of adjudication of delinquency of a juvenile is the same as that for any criminal case. In reviewing such cases, we do not weigh the evidence or determine witness credibility.

(Citation and punctuation omitted.) *In the Interest of M. L.*, 316 Ga. App. 413 (729 SE2d 548) (2012).

Construing the evidence presented at the adjudicatory hearing in the light most favorable to the juvenile court's ruling, the record showed that the victim, 19 years old at the time of trial, had a verbal altercation with Josh Pasco: "We had like exchanged words." A few days later, at about 7:00 p.m., Pasco and two other males approached the victim as he got out of his car in front of a recording studio. The victim testified that the second man, whom he identified by the nickname "Amp" and

2

police identified as Anthony Thomas, "came up to me, and swung, and missed." The victim grabbed Thomas, sat back down in his car, and used Thomas as a shield to peek around "to see what's really going on." The victim explained that Pasco stood in front of his vehicle and fired a shot through the windshield that landed in the passenger seat. The third person, whom the victim testified he did not know, reached through the passenger side window with a gun and attempted to hit the victim to get him to release his hold on Thomas.

The victim managed to push Thomas out of his car and drive away. He called police once he was "four or five blocks" away. The victim stated that he described the third person to police as an older guy, about "five-eight, five-nine," with a black shirt and "twist-ies in his hair." The victim testified that he knew C. S. and that C. S. was present the night of the attack, but he was "standing in the park, he didn't have nothing to do with it, he was just standing there," about 15 yards away. The victim explained that other people were standing in the park "coming to watch it, that's all they were doing, coming to watch it." Three other witnesses also testified that C. S. was in the nearby park with others observing the incident. One of these witnesses, a friend of Pasco's, testified that after the incident, Pasco told him "that the police

caught everyone," and that "that included [C. S.] because [C. S.] had been arrested at that time."

An investigator testified that she responded to the scene to find the victim bleeding from the mouth. She explained that the victim identified Pasco as "Josh" and Thomas as "Amp" but that he did not know the third person involved in the assault. Although the victim asserted that he described the third person to police as an older guy, about "five-eight, five-nine," with "twist-ies in his hair," the investigator testified that the victim described the third person as younger than Thomas or Pasco, Thomas' height or a little shorter, with "dreds . . . like, twisted." She testified that Thomas is 17 years old, Pasco is 18 years old, Thomas is 5 foot 9 inches tall, and C. S. is 5 foot 1 inch tall. She testified further that although the victim did not know the third attacker, police were able to identify this third person as C. S. from the victim's description and from Thomas, who denied any involvement, but explained that he, C. S., and Pasco "had been together all night."

The investigator explained that the victim told her he was formerly in a gang ("the 305 Boys and the 912 Boys"), and that when the three approached him in the parking lot, they made comments that the attack was in retaliation for the death of another "Blood member." She testified further that the victim "stated he didn't want

anything to do with this, because he felt like the Bloods would come after him if he would testify against the guys that were - - That shot at him." A detective testified that when he arrived at the scene, the victim told him "that the boys from 912 had shot at him." He stated further that C. S. "initially [ ] was associated or [a] member of the 305 Miami Bloods," Thomas and Pasco were each associated with the "912 criminal street gang," and the victim "was an associate of the 305 Miami Bloods," but "has been pretty inactive with that organization since he's been employed." The detective explained that "912, and 305, are both Bloods," and that "[t]hey're linked by the fact that they're family - - In the Blood family, they're both bloods."

Later that night, based upon information provided by the victim, officers went to Pasco's home where they found Thomas, C. S., Thomas' cousin and Pasco's parents. C. S. attempted to flee upon seeing officers, but was apprehended and taken to the police station. A detective testified that he interviewed C. S. for about 12 minutes. C. S. admitted that he, Thomas and Pasco had been "just hanging out," but denied any involvement in the assault. When the detective told C. S. that the police had probable cause to arrest him, C. S. responded that "[h]e'd take the three felonies."

The investigator further explained that during the investigation, the victim told her that his mother informed him, before he went to the recording studio, that three

individuals had come to his home looking for him. The investigator stated that "one of [the victim's] siblings recognized and knew [C. S.] by name" as one of the three individuals. The victim testified, however, that before he left for the recording studio, his mother called and told him that "some boys came looking for [him]. And, I was like, um who were they? And, my brother – And, he just said, [Pasco], [Thomas], and another guy in another - - but I don't know - -."

With regard to the three witnesses who asserted that C. S. stood in a nearby park during the assault, the juvenile court found: "[w]ith few exceptions, the Court places no credibility on the testimony of these witnesses." The court noted that two of the three were members of a street gang, that their testimony was "evasive, conflicting and inconsistent," and that one of the witnesses sent a Facebook message to C. S.'s mother stating that C. S. "was there when the shooting took place and that he had gone all the way up there where everything happened." The juvenile court found that the victim's testimony, to the extent it conflicted with his prior out of court statements, lacked credibility, including his description to police of the third assailant. The court noted that the victim, "[i]n violation of the court's express instructions when the witnesses were sequestered, [ ] put his arm around [ C. S.]'s mother . . . and whispered in her ear."

6

The court also found significant that one of C. S.'s three witnesses, a cousin of Pasco, testified that after Thomas and C. S. were arrested, Pasco told him "that the police had **gotten** everyone who was involved in the attack on the [victim], **except him**. Of course, the only others who had been **"gotten"** were [Thomas] and [C. S.]" Finally, the court explained that it was permitted to draw an inference that C. S.'s flight from police "evinces a consciousness of guilt," See, e. g., *State v. Frost*, ___ Ga. ___ Slip op. at 18 (Case no. S14G1767; decided June 15, 2015).

C. S. contends that the evidence presented was insufficient to support a finding that he assaulted the victim, either directly or as a party to a crime, because his mere presence at the nearby park was not enough to establish that he was one of the perpetrators. He argues that for this same reason, the evidence was insufficient to establish that he was in possession of a firearm. C. S. argues further that the testimony of the detective is insufficient to establish that he "was employed by or associated with any gang," and that "the assault in itself would not be enough to prove that [he], Pasco, and Thomas were all associated with each other as part of the same criminal street gang."

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. And

> [q]uestions as to the reasonableness of hypotheses are generally to be decided by the [fact finder] which heard the evidence and where the [fact finder] is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

(Citations and punctuation omitted.) *Rogers v. State*, 290 Ga. 18, 23 (4) (717 SE2d 629) (2011). Moreover, "criminal intent may be inferred from conduct before, during, and after the commission of a crime." (Citation, punctuation and footnote omitted.) *Gordon v. State*, 316 Ga. App. 42, 47 (1) (b) (728 SE2d 720) (2012).

The juvenile court, as the trier of fact, found C. S.'s witnesses lacked credibility, and that the victim lacked credibility to the extent his testimony was inconsistent with his prior statements to police. And we must give "due regard to the trial court's opportunity to judge witness credibility." (Citation, punctuation and footnote omitted.) *Snow v. State*, 318 Ga. App. 131 (1) (733 SE2d 428) (2012). While the court relied in part on hearsay testimony from the investigator and detective, this

8

testimony was not objected to and was therefore admissible evidence.[1] See OCGA § 24-8-802; *Bradshaw v. State*, 296 Ga. 650, 653 (2) n.2 (769 SE2d 892) (2015). The evidence was sufficient to enable the juvenile court to reject as unreasonable the hypothesis that C. S. stood in a nearby park and did not participate in the assault. See *Rogers v. State*, 290 Ga. 18, 23 (4) (717 SE2d 629) (2011). The court as fact finder could have found the hypothesis that C. S. was an innocent bystander unreasonable, particularly in light of the evidence of Pasco's statement that the police had "gotten" everyone involved. "Because the fact[ ]finder has heard the witnesses and observed them testify, it is considered more capable of determining the reasonableness of the hypothesis produced by the evidence or lack thereof than is an appellate court." (Citation and footnote omitted.) *Davidson v. State*, 295 Ga. App. 702, 706 (673 SE2d 91) (2009). We therefore conclude that the evidence relied upon by the trial court to find that C. S. was in fact the third assailant who put a gun in the car window and attempted to hit the victim, while circumstantial, was sufficient to exclude every reasonable hypothesis save that of C. S.'s guilt for the delinquent offenses of aggravated assault and possession of a firearm during the commission of a felony. See OCGA §§ 16-5-21 (b) (2), 16-11-106 (b) (1).

---

[1] C. S. has not raised a claim of ineffective assistance of counsel in this appeal.

9

The evidence was also sufficient to establish that C. S. violated OCGA § 16-15-4, which provides that it is unlawful for any person associated with a criminal street gang to engage in criminal street gang activity, including offenses involving violence or weapons. See OCGA § 16-15-3 (1) (j). The evidence presented showed that Pasco, Thomas, and two of C. S.'s witnesses were all associated with the "912 criminal street gang," that C. S. was initially associated with the "305 criminal street gang," that both of these gangs were in the Bloods family, and the attack upon the victim was in retaliation for the death of a "Bloods" gang member. See *Jackson v. State*, 272 Ga. 191,193 (1) (528 SE2d 232) (2000).

3. C. S. asserts that the juvenile court erred in considering evidence "not on the record" of the adjudicatory hearing. C. S. argues further that the court's failure to give him prior notice of its intention to consider this evidence, in addition to the evidence presented at the adjudicatory hearing, deprived him of due process. The court noted in its order finding delinquency that in "hearing and deciding the issues presented," it also considered portions of the testimony presented at the detention hearing.

While C. S. argues that he was denied due process by the juvenile court's failure to give him notice of its intention to consider evidence presented at the

detention hearing, his argument here in essence alleges an evidentiary error.[2] It is true that evidence presented at the detention hearing is for the purpose of determining "whether preadjudication custody of an alleged delinquent child is required." OCGA § 15-11-506 (a); see generally OCGA § 15-11-503. But even if C. S. is correct that a juvenile court should not also consider this evidence for purposes of adjudication, he has failed to show harm here, either from the court's consideration of the evidence or its failure to provide him with notice of its intention to do so. The juvenile court sits as the trier of fact in delinquency proceedings, see OCGA § 15-11-582 (b) (1), and here the same juvenile judge presided over both C. S.'s detention hearing and his adjudicatory hearing. The State presented an investigator and a detective at the detention hearing and they were cross-examined by C. S.'s counsel. The two also testified at the adjudicatory hearing and their testimony was in large part the same. Under these circumstances, we see no harm in the juvenile court's consideration of the testimony presented at the detention hearing. And, as we have held in Division 2, the evidence presented in the adjudicatory hearing was alone sufficient to support the juvenile court's finding of delinquency.

---

[2] C. S. cites to no authority, and we have found none, holding that the failure to give such a notice constitutes a denial of due process.

11

4. C. S. contends that the juvenile court erred in placing him in restrictive custody without "expressly making reference to all the required factors set forth in OCGA § 15-11-602 (b)." That Code section provides:

Every order shall include a finding, based on a preponderance of the evidence, of whether such child requires placement in restrictive custody. If placement in restrictive custody is ordered for a child classified as low risk, the court shall make a specific written finding as to why placement in restrictive custody is necessary. In determining whether placement in restrictive custody is required, the court shall consider and make specific written findings of fact as to each of the following factors

(1) The age and maturity of such child;

(2) The needs and best interests of such child;

(3) The record, background, and risk level of such child as calculated by a risk assessment, including, but not limited to, information disclosed in the probation investigation, diagnostic assessment, school records, and dependency records;

(4) The nature and circumstances of the offense, including whether any injury involved was inflicted by such child or another participant, the culpability of such child or another participant in

planning and carrying out the offense, and the existence of any aggravating or mitigating factors;

(5) The need for protection of the community;

(6) The age and physical condition of the victim;

(7) If the act was trafficking of substances in violation of Code Section 16-13-31 or 16-13-31.1, whether the circumstances involved sale, delivery, or manufacture of the substances, and if such circumstances were not involved, the court shall dispose of the act as a class B designated felony act; and

(8) If the act was aggravated child molestation and subject to the provisions of paragraph (2) of subsection (d) of Code Section 16-6-4, the court shall adjudicate the act as a delinquent act and impose a disposition in accordance with Code Section 15-11-601.

C. S. argues that the juvenile court erred in failing to expressly recite and make findings of fact regarding the third factor, OCGA § 15-11-602 (b) (3). But the court's order noted that it considered a Behavioral Health Evaluation, a Pre-Disposition Investigation Report, and a Pre-Dispositional Risk Assessment, and incorporated the information in those documents by reference. The court noted that the Behavioral Health Evaluation revealed that C. S. had been diagnosed with attention-

13

deficit/hyperactivity disorder; oppositional defiant disorder, unspecified depressive disorder, cannabis abuse disorder, and borderline intellectual functioning. With regard to C. S.'s record and background, the court found that at the time C. S. committed the offenses, he "was on probation for violation of probation and two counts of possession of a Schedule I Controlled Substance," and had "not responded to any of the efforts made by th[e] court to provide him with treatment and rehabilitation." The court found further that C. S. "has clearly been drawn into the criminal street gang life and is currently a member or associate of the 912 Bloods, aka 912 Folk Nation, which is a criminal street gang." So while not specifically delineated under a separate heading, the court considered and made specific written findings of fact as to C. S.'s "record, background and risk level." This claim of error is therefore without merit.

Case No. A15A1155

4. C. S. challenges the juvenile court's denial of his motion for an appeal bond and his request for a hearing on the matter. But in light of our holding in Division 2 above that the evidence was sufficient to sustain the finding of delinquency, we

14

dismiss this appeal as moot. See *Williams v. State*, 244 Ga. App. 692, 697 (6) (536 SE2d 572) (2000).[3]

*Judgment affirmed in A15A1154. Case dismissed as moot in A15A1155. Doyle, C. J. and Phipps, P. J., concur.*

---

[3]C. S. asserted in this appeal that the juvenile court erred in ruling that it did not have discretion to grant an appeal bond. While the court stated that the caselaw on the matter did not apply to juvenile court, it nevertheless considered the merits and ruled under the assumption that the caselaw did apply.