**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 25, 2015**

# In the Court of Appeals of Georgia

A15A0062. PONDER v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Demacio Ponder of ten offenses, and the trial court sentenced him to life in prison on convictions for rape and two counts of aggravated child molestation, ten years to be served consecutively in custody followed by ten years on probation for cocaine possession with intent to distribute, with additional time for the other offenses to be served consecutively.[1] After the trial court denied his motion for new trial, Ponder appealed, arguing that the evidence was insufficient to sustain his convictions for rape and one of the two aggravated child molestation counts and that his trial counsel was ineffective for failing to reasonably challenge the State's DNA evidence and for failing to object to improper testimony and closing argument. For the reasons that follow, we affirm.

---

[1]Ponder was also convicted of incest, child molestation, sexual battery, cruelty to children in the first degree, contributing to the delinquency of a minor, and possession of a firearm by a convicted felon.

On appeal from a criminal conviction, we construe the evidence in the light most favorable to the verdict,

> and the appellant no longer enjoys a presumption of innocence. An appellate court determines only the legal sufficiency of the evidence adduced below and does not weigh the evidence or assess the credibility of the witnesses. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citations and punctuation omitted.) *McMillian v. State*, 263 Ga. App. 782, 783-784 (1) (589 SE2d 335) (2003).

So viewed, the evidence in this case established that the 15-year-old victim reported to her boyfriend that she had been molested by her father, Ponder. The victim's mother testified that when she drove up to the boyfriend's house to pick up her daughter, the boyfriend yelled out that the victim was pregnant by her father. The victim left with her mother, who flagged down a uniformed officer in a patrol car and reported to him that she just found out that her daughter had been sexually assaulted by her father and was pregnant. The officer directed the victim and her mother to police headquarters, and the case was assigned to a detective with the Special Victims Unit who primarily worked on sex crimes involving minors.

The victim was examined in a local children's hospital by an emergency room doctor for the chief complaint of sexual assault. The victim admitted to vaginal and oral penile penetration, and tested positive for pregnancy. An examination revealed no physical findings or DNA related to sexual assault. The doctor testified that the victim reported that she had been physically assaulted a week or two previously, and the doctor found several bruises on the victim's torso that were more than a day old.

The victim's eight-week pregnancy was terminated and the products of conception were released to the detective and ultimately examined by a forensic biologist with the GBI crime lab who was an expert in DNA profiling. The expert explained that he was unable to obtain a complete DNA profile from the genetic material because it contained predominantly female DNA, which probably belonged to the victim, with only a very small portion containing male DNA, which probably belonged to the fetus. Being unable to develop a complete profile of all 23 pairs of chromosomes, which would have given a very exacting match, he was able to examine only the Y chromosome, or haplotype (meaning half of a chromosome pair), which establishes only paternal lineage. The expert determined that the haplotype was the same as Ponder's but not the same as the victim's boyfriend, thus excluding the boyfriend as a possible contributor to the genetic material he tested. He also testified

that all males related to the father in any degree had this haplotype, and that, based on a formula applied to a limited database of male haplotypes in the United States, approximately one in 940 African-American men shared this particular haplotype.

The victim, who was 18 as of trial, testified that she did not have a relationship with Ponder until she was 13, after Ponder's grandmother died in 2008. After that, she began to spend weekends with Ponder because her mother was concerned about the victim's relationship with her boyfriend and thought she needed a male role model. Several people lived in the same house as Ponder, including his mother, his sister and her two children, two or three uncles, and occasionally Ponder's son. In 2009, the victim began living at Ponder's house during the week, normally sleeping in his room, sometimes in pajamas but sometime in her street clothes because the house had "a lot of bugs."

The victim testified that when she told Ponder that she wanted to be a criminal forensic specialist when she grew up, he said he would show her something else, and taught her "how to sell dope." He taught her how to weigh the dope, put it into packages, and place the packages in the freezer "until somebody comes." If Ponder was not present when someone came to buy the dope, she sold it to them.

4

The victim testified that she generally slept in Ponder's bedroom when she stayed with him, and that Ponder had molested her there between five and ten times. Despite the State's efforts to clarify which specific parts of Ponder's body touched which specific parts of the victim's body, the victim's testimony was somewhat indirect. She testified that Ponder felt her with his hands over his clothes in her "lower area." When asked to identify which part of her lower area Ponder touched, the victim said her "front side," and when asked what she did with that area or what it was for, she responded, "To pee." When asked if Ponder touched any other areas, the victim testified that Ponder got on top of her, removed both of their clothes, and "started having sex with me," further explaining that he had inserted his penis into her. When asked what part of her body Ponder inserted his penis into, the victim replied, "In my pants area." The State asked, "In your panties?," and she responded yes. She also testified that Ponder's penis touched her bottom and his mouth touched her "pants area." Finally, when asked if her mouth touched any part of Ponder's body, the victim said yes, and when asked "Besides his penis?," she said no.

Finally, the victim testified that on the last occasion she saw Ponder before her outcry, they were at the house of her little brother's mother, where Ponder asked her to clean her brother's room. When she said no, Ponder punched her in the face and

the back of the head and banged her head on the hardwood floor. She ran out of the door when Ponder went to the restroom and went first to her godmother's house and then to her mother's house. When asked why she had not returned to her mother's house when the molestation first occurred, she responded that she did not know but that she did not want to be at her mother's either because the two-bedroom residence was already crowded with her mother's boyfriend and his two children, with whom she did not get along.

The detective testified that a search of Ponder's bedroom pursuant to a warrant uncovered a bulletproof vest, identification and paperwork with Ponder's name on it, a loaded .38 caliber handgun, small baggies, a scale, a plate with white residue on it, and 25 individual packages of cocaine in a freezer. Based on his experience, that amount of cocaine was not for personal use but for distribution, and the scales and baggies were tools used by drug dealers.

After the State rested, the trial court granted Ponder's motion for a directed verdict on two counts of the indictment, one that accused Ponder of child molestation for placing his hands on the victim's breasts and one that accused him of sexual battery for making physical contact with the victim's breasts. The jury then convicted Ponder on eight counts, finding him not guilty only on Count 10, which charged him

6

with cruelty to children in the first degree for maliciously causing the victim cruel and excessive mental pain by forcing her to package and sell cocaine.

The jury subsequently considered Count 13 of the indictment charging Ponder with possession of a firearm after being conviction of theft by receiving stolen property. The State introduced a certified copy of that conviction, both sides argued, and the trial court charged the jury as to the law regarding that offense. The jury also found Ponder guilty on that count.

1. Ponder contends that the evidence was insufficient to sustain his convictions for rape and aggravated child molestation by placing his mouth on the victim's female sex organ to arouse and satisfy his sexual desires.

(a) Although Ponder has not challenged the sufficiency of the evidence regarding the other eight counts for which he was convicted, we find that the evidence as summarized above was sufficient for a rational trier of fact to have found him guilty of those crimes — incest, sexual battery, a second conviction for aggravated child molestation, child molestation, sexual battery, cruelty to children in the first degree, contributing to the delinquency of a minor, cocaine possession with intent to distribute, and possession of a firearm by a convicted felon — beyond a

7

reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *New v. State*, 327 Ga. App. 87, 89 (1), n. 5 (755 SE2d 568) (2014).

(b) Ponder argues that the evidence was insufficient to sustain his rape conviction because the State failed to introduce evidence of the essential element of force. Ponder was indicted for violating OCGA § 16-6-1 by having carnal knowledge of the victim forcibly and against her will, and was not indicted for or convicted of statutory rape. The indictment thus charged the essential elements of the crime of forcible rape: (a) carnal knowledge, defined in OCGA § 16-6-1 (a) as "any penetration of the female sex organ by the male sex organ," (b) forcibly, meaning with the use of "acts of physical force, threats of death or physical bodily harm, or mental coercion," and (c) against the victim's will, meaning without her consent. *State v. Collins*, 270 Ga. 42, 43 (508 SE2d 390) (1998).[2]

---

[2]While our court has stated in *Haynes v. State*, 326 Ga. App. 336, 338 (1), n. 3 (756 SE2d 599) (2014), *Thomas v. State*, 306 Ga. App. 8, 9, n. 2 (701 SE2d 525) (2010), and *Stover v. State*, 293 Ga. App. 210, 212 (1) (a), n. 2 (666 SE2d 602) (2008), that *Collins* was superceded by statute, citing *State v. Lyons*, 256 Ga. App. 377 (568 SE2d 533) (2002), *Lyons* did not so hold. Rather, this court in *Lyons* noted that, pursuant to a suggestion in *Collins*, the legislature amended the forcible rape statute to remove the force element if the victim is younger than ten. OCGA § 16-6-1 (a) (2). *Collins* remains good law. See *Mangrum v. State*, 285 Ga. 676, 682 (9) (681 SE2d 130) (2009).

8

In this case, as described previously, the victim testified that Ponder inserted his penis into her, and upon further questioning identified the part of her body into which Ponder inserted his penis as her "pants area," which, along with other evidence that the victim became pregnant and thought the pregnancy was by Ponder, constitutes sufficient evidence of the element of carnal knowledge.

Further, "[t]he fact that a victim is under the age of consent may supply the 'against her will' element in a forcible rape case since it shows that the victim is incapable of giving legal consent." *Collins*, 270 Ga. at 43. See also *Drake v. State*, 239 Ga. 232, 233 (236 SE2d 748) (1977), superseded by statute on other grounds.[3] The State's evidence that the victim in this case was 14 or 15 when the acts occurred is sufficient to establish that the act was committed against her will.

Finally, although the victim's age of 15 does not establish the required element of force, the State was required to present only minimal evidence of force because the victim was under the age of consent. *Thomas v. State*, 306 Ga. at 9. In such a case, intimidation may substitute for force. Further, force may be proved by direct or

---

[3]The age of consent at common law was 10. The codification of statutory rape in the Georgia Penal Code of 1910 raised the age of consent to 14, and a subsequent revision to OCGA § 16-6-3 (a) in 1995 raised the age to 16, where it now stands. *Collins*, 270 Ga. at 49 (Hunstein, J., dissenting.)

9

circumstantial evidence. Lack of resistance, induced by fear, is force, and may be shown by the victim's state of mind from her prior experience with the defendant and subjective apprehension of danger from him.

(Citation and punctuation omitted.) *Wightman v. State*, 289 Ga. App. 225, 228 (1) (656 SE2d 563) (2008).

After questioning the victim about the specifics of the acts for which Ponder was indicted, the State asked her, "Did you want to do those things with your father in his room?" The victim responded, "No, ma'am," and the following exchange took place:

> [STATE]: Why did you do those things if you didn't want to?
> [VICTIM]: I don't know.
> [STATE]: Did — tell me what was going on in your mind. Tell me what you were thinking.
> [VICTIM]: In my mind I knew it wasn't right and I knew I should tell somebody. But, like I said, I wouldn't tell my sister because I knew that she would tell my mama. And everything would just come down to losing my mama. I didn't want to lose my mama.
> [STATE]: Did you want to help your dad sell the drugs?
> [VICTIM]: No, ma'am.
> [STATE]: So what was going through your mind when you were doing those things?
> [VICTIM]: Nothing.

[STATE]: How did you feel about him back then?

[VICTIM]: How did I feel?

[STATE]: Uh-huh.

[VICTIM]: I just always felt like if a father loved his child, *he wouldn't make a child do things like that.*

[STATE]: During any of the time that this was going on, did he ever say anything to you or talk to you about it?

[VICTIM]: No, ma'am.

(Emphasis supplied.)

As stated previously, "the quantum of evidence to prove force against a child is minimal. And such force may be proven by direct or circumstantial evidence" (Citation and punctuation omitted.) *Haynes v. State*, 326 Ga. App. 336, 338 (1) (756 SE2d 599) (2014). The victim testified that she felt that if Ponder loved her, he would not *make her* do "things like that." Based upon this and other evidence at trial, we find that the jury was authorized to find Ponder guilty of rape beyond a reasonable doubt.

(c) Ponder argues that the State failed to introduce sufficient evidence to sustain his conviction for aggravated child molestation, Count 3. The indictment charged Ponder with the offense of aggravated child molestation by placing his mouth on the victim's female sex organ with the intent to arouse and satisfy his sexual

11

desires, and Ponder contends that the only direct evidence pertaining to this charge was the following:

> [STATE]: Did his mouth touch any part of your body?
> [VICTIM]: Yes, Ma'am.
> [STATE]: In what part of your body?
> [VICTIM]: My pants area.

Ponder further contends that the vague description "pants area," absent additional testimony, is not enough to allow the jury to infer that the victim meant that Ponder placed his mouth on her female sex organ as charged in Count 3.

As previously described, while exploring the specifics of the victim's testimony regarding the act of sexual intercourse, the State asked her, "What parts of your body did he insert his penis into?". She answered, "In my pants area." From this testimony the jury could infer that when the victim subsequently testified that Ponder's mouth touched her "pants area" she meant her female sex organ. See *Hernandez v. State*, 319 Ga. App. 876, 877-878 (1) (738 SE2d 701) (2013) (victim's testimony that defendant placed his mouth on her "lower private area" was sufficient for jury to infer that victim was referring to her vagina). Accordingly, we conclude that the State presented sufficient evidence to sustain the conviction for this count of aggravated child molestation.

2. Ponder claims his trial counsel was ineffective in several respects. Ineffective assistance is a deficient performance by counsel resulting in actual prejudice to the client. *Head v. Hill*, 277 Ga. 255, 266 (VI) (587 SE2d 613) (2003). On appellate review of an ineffective assistance of counsel claim, this Court accepts the trial court's credibility determinations unless they are clearly erroneous, but review the trial court's legal conclusions de novo. *Lucas v. State*, 328 Ga. App. 741, 745 (2) (760 SE2d 257) (2014).

(a) Ponder first contends his trial counsel was ineffective for failing to reasonably challenge the State's DNA evidence by calling an expert to rebut the State's interpretation of the test results. Before trial, Ponder's trial counsel filed a motion in limine to exclude the DNA testing results. During a pre-trial hearing on the motion, he argued that because the mother's DNA so "overwhelmed" that of the fetus at six weeks, it would have been extremely difficult to generate a complete DNA profile to determine whether Ponder was responsible for the conception. Instead, the "Y-STR"[4] test that was performed determined only that the victim's boyfriend could

_____

[4]"Y" refers to the fact that the test looks at only the Y chromosome rather than the other 45 chromosomes that comprise human DNA, and "STR" stands for "short tandem repeats," a method of amplifying the available genetic material for testing.

13

not have impregnated the victim but that Ponder could have, along with any other male relative of his, no matter how remote the relationship.

Ponder's counsel argued during the hearing that the anticipated testimony of the State's GBI crime lab expert was that one in 940 male African Americans had this particular Y haplotype, which mean that almost 500 out of Atlanta's population of 500,000 African American men would also have that haplotype. Without more specific profiling, he argued, the DNA evidence was more prejudicial than probative. After exploring the statistical evidence further, the trial court noted that Ponder was not challenging the validity of the science behind the test but was arguing that it was inadmissible because it was too prejudicial. The court denied the motion in limine, concluding that the evidence was relevant and probative, and that the prejudicial aspects of the evidence could be explored through rigorous cross-examination.

At trial, as noted earlier, the DNA profiling expert testified about why he could not perform a complete DNA profile on the genetic material and that his limited testing excluded the victim's boyfriend but not Ponder or any of his male relatives. He also testified that this Y haplotype matched none of the haplotypes included in the largest database available, which contained a total of 8,487 haplotypes, 2,841 of which were from African American males. He further testified that "the actual

14

statistic generated of saying how common or how frequent would you find this type among the general population, or in this case the African-American population," was 1 in 940. The State asked how he could estimate that the haplotype would be found in 1 of 940 African American males when it matched none of the haplotypes in the database, he responded obscurely, "The statistic takes the basically how frequent would you find this amongst in the database for the markers being put in (sic)."

On cross, Ponder's counsel elicited details from the expert about the database, including how it was assembled and that it contained duplicates of some haplotypes. The expert also testified on cross that certain haplotypes could be clustered geographically depending on migration patterns and could appear in different numbers within "discrete racial groups." On re-direct, confusingly, the expert testified that the database did not include duplicate haplotypes because that would skew the estimate of how frequently a particular haplotype occurred within the populations. In closing, trial counsel pointed out that the State presented no evidence that any of Ponder's male relatives were even interviewed, that this haplotype did not appear in the database at all, and that no evidence showed where the haplotypes in the database came from or how frequently it might appear in the South.

15

At the hearing on his motion for new trial, Ponder called an expert in forensic DNA analysis to testify. The expert testified that the database from which the GBI expert derived his ratio of 1 in 940 consisted of all the Y haplotypes the federal government was able to gather from about 20 agencies around the country. The ratio was based on a formula, and when the formula was applied to a larger database, it would appear to be rarer.

Ponder's trial counsel testified that he had obtained from the GBI all of the information it had related to the DNA testing, reviewed it, researched the issue, retained a biologist at Georgia Tech who reviewed the material, discussed the issue with the biologist, and talked to the GBI biologist who did the test. The Tech biologist told him that the test did not exclude Ponder as the donor and briefly explained how the ratio of 1 in 940 was generated. Trial counsel admitted that he did not question the GBI expert in detail at trial regarding that ratio, and agreed it would have been helpful to the defense if he had brought out the fact that the ratio changed depending on the number of haplotypes contained in the database. However, based on his consultation with the biologist, who did not indicate that the GBI examiner had made any error in the testing, trial counsel testified that he saw no point in calling his own expert witness. He thought that belaboring the DNA results would not be in

16

Ponder's best interest because the evidence was very damaging and would not improve by having another expert draw more attention to it. Trial counsel noted that he had extracted a lot of testimony about numbers during his cross-examination of the GBI expert, and thought that the jury did not "seem particularly interested in the DNA by the time we were done."

In its order denying Ponder's motion for new trial, the trial court reviewed trial counsel's testimony that the DNA evidence was "very damaging and simply would not get any better by having another expert come in to discuss it." The court opined that, while the presentation of Ponder's DNA expert at the motion for new trial hearing

> was more sophisticated (and more accessible) than the GBI Crime Lab forensic analyst's testimony at trial, the ultimate conclusion was the same: Defendant or a male blood relative of his had sex with [the] fifteen-year-old [victim]. And, as trial counsel made clear, because there were no alternative male relatives of Defendant that the defense could plausibly point to, emphasizing this scientific fact was not in his client's best interest.

The trial court concluded that the decision whether to call an expert witness was a matter of trial strategy within the broad range of professional conduct afforded trial attorneys, citing *Davis v. State*, 290 Ga. 584, 586 (2) (a) (723 SE2d 431) (2012).

17

We agree with Ponder that the GBI expert's explanation of how he derived the "1 in 940" ratio was less than clear, and that the testimony of Ponder's expert at the post-trial hearing showed that this ratio was malleable. But regardless, the main point was the test excluded the boyfriend and did not exclude Ponder.

Further, even if the jury had been thoroughly tutored about the fact that the formula does not literally establish how frequently the haplotype occurs in the population, the State still could have presented evidence that the application of the formula to the database was an accepted scientific method of estimating that frequency. As the trial court noted during the motion for new trial hearing, the database would only grow larger as time goes on, and Ponder's expert testified that applying the formula to a bigger database would only result in estimates that any particular haplotype was rarer, which was hardly helpful to Ponder's defense. We conclude that the trial court did not abuse its discretion in holding that the decision of Ponder's trial counsel not to call a DNA expert was not deficient performance and did not constitute ineffective assistance of counsel.

(b) Ponder contends his trial counsel was ineffective for not objecting to the testimony of the victim's mother that vouched for her daughter's credibility. The mother testified that when the victim's boyfriend told her that the victim was pregnant

18

by Ponder, she "instantly knew that because I had already had that woman instincts [sic]." When the State asked about her testimony that she knew about the crimes, she responded, "I had had that suspicion. I'm spiritual. And it just kept coming to me. And I would ask her, you know, I had — it was like God was preparing me." Finally, she testified that she had been suspicious because she was "an older woman, knowing the promises that an older man will tell a girl. I just suspected it. Just — it was my gut instinct saying something is not right. But I couldn't get the answer from her."

Ponder argues that his trial counsel should have objected to this testimony because it constituted improper bolstering, particularly in this case where the primary evidence against Ponder was the victim's testimony. Ponder is correct that the credibility of a witness is for the jury to determine, and that the mother's testimony could be construed as bolstering the victim's testimony. See *Granger v. State*, 320 Ga. App. 580, 582 (1) (740 SE2d 313) (2013). But trial counsel explained that his theory of defense was that the victim's mother was so biased against Ponder that she was ready to believe whatever bad things the victim said about him, so he wanted her to keep talking as much as possible to display her bias. Additionally, he thought that the more the mother testified, the crazier she sounded and therefore he did not object when she testified about her suspicions, her gut instincts, her "woman instincts," and

19

her spirituality. Trial counsel testified at the new trial hearing that he used the mother's testimony to his advantage during his cross-examination of her, which brought out that, despite her professed suspicions, she continued to let her daughter go stay with Ponder overnight. During closing, he argued that the fact that the victim's mother did not like Ponder was apparent from her demeanor on the stand, and that she was "quite willing to believe the very worst of Mr. Ponder the second she heard" the victim's accusations. Trial counsel's decision not to object to the testimony of the victim's mother that she believed her daughter was thus strategic in nature, and the trial court did not err in concluding that trial counsel was not ineffective on this ground.

(c) Ponder asserts his trial counsel was ineffective for failing to object when the State in closing referred to facts not in evidence (standing in the victim's closet and picking a dress for her to wear and the victim having to take a break to go hug her mom in the hall) and violated the Golden Rule by asking the jurors to place themselves in the victim's position (asking the jurors to imagine how hard it would be to tell strangers that your father raped you). Counsel testified that he made a deliberate strategic choice not to object at this point because he had emphasized in closing that the victim cried during her direct examination but had a different, "fairly

20

confrontational" demeanor during cross-examination. He "made a big deal" in his closing about how genuine the victim's emotions were, so he thought that if the State wanted to argue that the victim "was emotionally upset the whole time, when clearly she was not, then that was fine." Further, he argued in closing that the prosecutor had told the victim how to wear her hair and had picked out a dress for her. The decision not to object was therefore clearly strategic. The trial court did not err in concluding that Ponder did not show "that no competent attorney, under similar circumstances, would have made," that decision citing *Bowie v. State*, 286 Ga. 880, 883 (3) (b) (692 SE2d 371) (2010), and that trial counsel's performance was not ineffective on this ground.

(d) Finally, Ponder argues his trial counsel was ineffective for failing to object when the State argued in closing that "[t]elling someone that you participated in incest with your father is not a lie that people tell." He also contends trial counsel should have objected when the State argued that it would have done no good to test the DNA of every male in the house because "if there was any man on the planet that was going to come in here and say, I did it, here is my DNA and it matches, then that would have been the first thing you heard." Ponder contends that the State improperly

21

vouched for the victim's credibility in these instances and that it was unreasonable for trial counsel not to object.

It is improper for the State to vouch for a witness's credibility. *Collier v. State*, 266 Ga. App. 345, 357 (3) (b) (596 SE2d 795) (2004). The State argues here that it was not vouching as to the victim's credibility but was rather drawing an inference from the evidence presented, but trial counsel admitted in the motion for new trial hearing that the arguments could be seen as vouching and that he had no strategic reason not to object.

> But even assuming counsel's conduct was deficient in this respect, the vouching in this case was only implied and occurred [during closing argument]. The jury was properly instructed that the credibility of the witnesses was for them to determine considering all the facts and circumstances of the case, and that the evidence in the case does not include the opening statements or closing arguments by the attorneys or the questions asked by the attorneys. Given the substantial evidence of [Ponder's] guilt, we agree with the trial court's conclusion that failure to object to the complained-of question in this case did not undermine the fundamental fairness of the trial.

*Bell v. State*, 294 Ga. 443, 445-446 (2) (754 SE2d 327) (2014).

*Judgment affirmed. Ray and McMillian, JJ., concur.*

22