**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 10, 2015**

# In the Court of Appeals of Georgia

A15A1439. HEARD v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Antonio Heard of armed robbery, burglary, and a weapons charge following a home invasion. The trial court sentenced him to 35 years, with the first 15 to be served in custody, and denied Heard's motion for new trial. On appeal, Heard contends that the evidence was insufficient, that the trial court should have exercised its discretion and granted him a new trial, that the trial court erred in limiting the testimony of the officer who took Heard's statement and in admitting evidence of Heard's prior conviction, that his trial counsel was ineffective, and that he was denied his right to be present at all court proceedings. For the reasons that follow, we affirm.

1. On appeal, we view the trial evidence in the light most favorable to the verdict. *Peoples v. State*, 295 Ga. 44, 45 (1) (757 SE2d 646) (2014). So viewed, the evidence shows that the two victims were asleep in their living room when they woke

up to find two men holding guns to their heads. Neither victim was able to see either gunman's face and did not recognize their voices, which were disguised. They heard a third person ransacking the rest of the house, and one of the gunmen said the other men "came to kill." The intruders repeatedly asked where the victims' money and drugs were located, and one ripped the male victim's pants off and took $1,500 from the pockets. Another gunman took the female victim's cell phone, and then the three intruders left through the front door.

After waiting a short time, the two victims went across the street to call 911 from a relative's house. When the police came and walked through the residence with the victims, they saw that a bedroom window had been opened and there was a footprint on their bed under the window. Nothing else was taken from the house, although the kitchen cabinets and refrigerator were open and groceries littered the floor. The police found a bullet on the living room floor by one of the sofas, which had not been there before the intruders came in. Neither victim could identify any of the intruders.

A friend of the female victim who lived across the street testified that the night after the home invasion, she was playing cards with Heard when the two of them decided to get some fast food. As they waited in the drive-through line, a policeman

in a patrol car pulled in line behind them. Heard pulled a wad of $20 bills and a bag of marijuana from his pocket and a gun from the front of his pants, but the police did not approach them. After they got their food, Heard and the witness drove off, but instead of going straight back to the witness's house, Heard drove to his mother's house because, he said, he "had to run and get something."

The witness waited in the car for about ten minutes until Heard returned and he began driving back to the witness's house. As he drove, Heard told the witness that he and three other men he identified by name had robbed the victims, then asked the witness how close she was to the female victim. When the witness said she was very close to the victim, Heard ran off the road, seemingly deliberately, hit a picket fence, and drove back onto the road. He stopped the car to inspect the damage to the car's front end, and declined the witness's request to use his cell phone to call someone to come pick her up, insisting instead on driving the damaged car back to the witness's house. The following day, Heard came to the witness's house and said that if anyone asked how the car had been wrecked, she was to tell them that the male robbery victim had run them off the road. Heard said he was going to get his gun because the "word had got out by then on the streets" that he had been one of the robbers. The

witness told the police about Heard's admission, and after a number of people were interviewed, Heard was arrested.

Heard waived his *Miranda* rights and confessed to the crime in detail, admitting that he and the other intruders had climbed through the victims' bedroom window, stepped on to the bed, held the victims at gunpoint, searched their house, and robbed them of about $1,500. Heard identified one of the other intruders as Michael Stanley and shortly afterward identified the third intruder, whose name he did not know, through a photo line-up. The police identified the third man as Rolundus Middleton, against whom charges were pending as of trial.

Upon request, Stanley voluntarily came to the police station, where he also waived his *Miranda* rights and confessed to the crimes. Stanley pled guilty to one count of burglary and two counts each of armed robbery and weapons charges, and his testimony in Heard's first trial, which ended in a mistrial, was consistent with his statement to the police. When Stanley testified in Heard's second trial, he denied that Heard and Middleton had been involved in the invasion. While he admitted he told the investigating officer otherwise, he said he did so only because "someone gave [the officer] a statement before I did that we were the three ... involved in the robbery, so

4

I was going along with what the first person had made the statement saying I was involved." The State impeached Stanley with his testimony from the prior trial.

Heard testified in his defense and also explained that he confessed to the crimes because the investigating officer had threatened to arrest his mother, who had just had a procedure on her back, for terroristic threats. After the threat, Heard said, he just repeated details of what he had heard about the invasion and put himself "on the scene." He admitted he had a prior conviction for what was "supposed to be attempted burglary," to which he pled guilty.

The evidence as outlined above was sufficient for the jury to find beyond a reasonable doubt that Heard committed the offenses of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *Rudison v. State*, 322 Ga. App. 248, 249-250 (1) (744 SE2d 444) (2013).

Heard also argues that the evidence was so close that the trial court abused its discretion by failing to grant a new trial, but argues the standard of *Jackson v. Virginia*, which is whether any rational trier of fact could have found Heard guilty beyond a reasonable doubt.

Under OCGA § 5-5-20, a trial court may grant a new trial if it decides that the jury's verdict is contrary to the principles of justice and equity, and under OCGA §

5-5-21, a trial court may grant a new trial if the verdict is decidedly and strongly against the weight of the evidence. "When properly raised in a timely motion, these grounds for a new trial — commonly known as the 'general grounds' — require the trial judge to exercise a broad discretion to sit as a 'thirteenth juror.' " *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013). Here, Heard argued that the trial court should exercise its discretion to grant a new trial, and the trial court did so, finding that the verdict was not contrary to the law or evidence, and was not inconsistent with the evidence as presented at trial. Accordingly, we find no merit to this enumeration.

2. Heard argues that during the *Jackson-Denno* hearing, the trial court improperly limited his examination of the police officer to whom he confessed, and that if the trial court had allowed him to impeach the officer with questions about whether he had made promises of benefit to another man, the trial court would have excluded Heard's statement from evidence.

During the hearing, Heard asked the officer if he ever promised interviewees anything, and the officer responded, "As far as what the Judge or jury will be finding, no. I can't promise anything like that. No. If I say something like I promise I'll get the other person involved or something[, y]es. I'm sure I make those types of promises." Heard then asked the officer what he had said to a man whose connection to this case

6

is not clear from the record, and the State objected because it was not going to admit that man's statement and the questions were irrelevant to the admissibility of Heard's statement. While the trial court acknowledged that Heard might be able to challenge the officer's credibility on cross-examination at trial with questions about promises he had made to other people, it sustained the objection to the questions during the *Jackson-Denno* hearing because the answers were not relevant to the issue before the court, which was whether Heard's statement was admissible.

At trial, Heard fully explored this issue during his cross-examination of the officer. While he argues on appeal that the trial court should have considered this "impeachment" evidence during the *Jackson-Denno* hearing to determining the admissibility of Heard's inculpatory statement, the officer testified at trial that the other man was not under arrest and he had not been given *Miranda* warnings. Rather, the officer was "fishing" for information and also wanted the man to tell anyone who might know something that the issue was serious and that the officer would speak to the prosecutor's office on behalf of the first one to come forward and admit involvement. In that context, the evidence was not relevant to whether Heard's confession was voluntary or not, which was the issue before the trial court at the hearing. Accordingly, this enumeration is without merit.

7

3. Heard argues that his trial counsel was ineffective because he "failed to highlight and press the issues relating to [Heard's] comprehension of the *Miranda* warning and the threats to [Heard's] family in the same manner that trial counsel did in the initial trial of the instant case." The standard for determining whether counsel is ineffective, however, is not whether counsel conducted a defense in the same manner as he did in a previous trial. "Ineffective assistance is a deficient performance by counsel resulting in actual prejudice to the client." *Ponder v. State*, 332 Ga. App. 576, 582 (2) (774 SE2d 152) (2015). "Because a defendant must show both deficient performance and actual prejudice stemming from the deficiency, an insufficient showing on either one of these prongs exempts an appellate court from the need to address the other prong." *Sims v. State*, 297 Ga. 401, 404 (4) (774 SE2d 620) (2015). Pretermitting whether trial counsel's performance in this case was in any way deficient, the evidence against Heard, including his confession and that of his co-defendant, was overwhelming. Thus, Heard has not shown a reasonable probability that the outcome of the trial would have been different had counsel pursued the same inquiries in the same manner that he did during the first trial, and this enumeration fails. See *Sanders v. State*, 290 Ga. 637, 641 (5) (723 SE2d 436) (2012).

4. Heard asserts that the trial court erred in admitting evidence of his prior conviction for attempted burglary, contending that it was far more prejudicial than probative and that its admission was an abuse of discretion because the evidence against him was "close." While the trial court did rule out of the jury's presence that it would overrule any objection Heard would make to the State's tender of evidence of his prior conviction, the court also instructed counsel to generically restate his objection before the jury when the issue arose. But the State did not introduce the evidence; rather, Heard preemptively admitted during his direct examination that he had previously pled guilty to attempted burglary. "[A] defendant who testifies on direct examination about his prior convictions may not on appeal challenge the trial court's ruling and claim that the admission of such evidence was error." (Citation and punctuation omitted.) *Merritt v. State*, 329 Ga. App. 871, 874 (2) (766 SE2d 217) (2014). Accordingly, this issue is waived.

5. Finally, Heard contends that the lawyers and the trial court conducted a conference during the trial outside of his presence, thus violating his right to be present at all proceedings.

While both the United States and Georgia Constitutions secure the right of criminal defendants to be present at all critical stages of the proceedings against them,

9

unlike the federal constitutional right, the violation of the State constitutional right to be present is presumed prejudicial, and absent waiver, "triggers reversal and remand for a new trial whenever the issue is properly raised on direct appeal." *Peterson v. State*, 284 Ga. 275, 279 (663 SE2d 164) (2008).

The stage from which the defendant is absent must be a critical one, however, to implicate either the federal or State Constitutions. '[T]he right to be present exists where there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence." *Parks v. State*, 275 Ga. 320, 322-323 (3) (565 SE2d 447) (2002). Here, Heard argues that "procedural and scheduling conferences were held outside [his] presence," but such conferences are not "critical" proceedings at which Heard had a right to be present. Id. at 324-325.

Heard also argues that the trial court's statement from the bench before sentencing that someone from the press had called the judge's office during trial and said that the judge's house was being raided, and his trial counsel's testimony at the motion for new trial hearing — that he had become aware of some kind of rumor to that effect — "raised concerns about the fairness of his trial." However, trial counsel also testified that no conference took place regarding this rumor, and the trial court

10

explained during the hearing that the sheriff told him such calls were not unusual and that no raid was taking place. Heard has not shown that he was denied his right to be present at any critical stage of his trial, and therefore has shown no error.

*Judgment affirmed. Ray and McMillian, JJ., concur.*